Argued October 7, 1953, reversed March 31, 1954

In the Matter of the Jurisdiction of the Public
Utilities Commissioner of Oregon Over
Rates and Charges of Railroads

## SOUTHERN PACIFIC COMPANY et al. v.
## HELTZEL AND PACIFIC INLAND
## TARIFF BUREAU, INC.

268 P. 2d 605

*Frank C. McColloch* argued the cause for appellants. With him on the briefs were Koerner, Young, McColloch & Dezendorf, Edwin L. Graham and Joseph Larkin, of Portland.

*Robert R. Hollis,* Assistant Attorney General, argued the cause for respondent Charles H. Heltzel, Public Utilities Commissioner of Oregon. With him on the brief were George Neuner, Attorney General, John R. McCollough and Wallace G. Mills, Assistant Attorneys General, of Salem.

*William B. Adams* and *Arlus C. Morris,* of Portland, filed a brief for respondent Pacific Inland Tariff Bureau, Inc.

ROSSMAN, J.

This is an appeal from an order of the Circuit Court for Marion County which dismissed a petition

for a writ of prohibition. The petition prayed that a writ issue directed to the Public Utilities Commissioner of Oregon (ORS 756.020) prohibiting him from conducting a hearing into the reasonableness of some tariffs which two of the petitioners had filed lowering the rates for the transportation of petroleum products by rail to points in Southern Oregon, from Portland on the one hand and from Coos Bay-North Bend upon the other. The petitioners (now appellants) are the Oregon, California & Eastern Railway, the Southern Pacific Company and their general agent. Since the general agent is immaterial to any issue before us, we need mention him no further. For the purposes of convenience we will refer to the petitioners as the railroads.

The complaint which instituted the proceeding before the Commissioner was filed by the respondent-intervenor Pacific Inland Tariff Bureau, Inc., an association composed of more than 400 motor carriers which are engaged in both intrastate and interstate commerce. We will refer to that organization as the Bureau. Thirty-four of its members are engaged in the transportation of petroleum products, and 21 of that group have destination points in Southern Oregon. Those carriers serve some of the persons and localities which are also supplied by the railroads. But, in addition to serving customers and points reached by the railroads, they supply others in Southern Oregon that have no rail connections. The complaint, in referring to the oil depots from which the motor carriers that transport petroleum products receive these shipments, says: "Many of the bulk plants in Southern Oregon either are in cities off-rail or are off-rail in cities which themselves are on rail." We include that excerpt in this opinion because it shows that many of the shippers

and receivers of oil products in Southern Oregon do not use the railroads' facilities, but depend exclusively upon motor carriers.

Neither the Bureau nor any of its members ships or receives petroleum by rail. The motor carriers and the railroads receive in Portland and North Bend some of the oil which they distribute to consignees in Southern Oregon. But the motor carriers also receive in some cities which are not reached by any railroad, such as Crescent City, California, petroleum products which they transport into Southern Oregon. Crescent City is 50 miles or so from any railroad. Oil is transported by ocean-going barges from San Francisco Bay points to storage tanks which are located in that city, and later the motor carriers transport it from the tanks to consumers in the southern part of this state.

The foregoing shows that the routes pursued by the motor trucks and the railroads do not always parallel one another. It also shows that the persons and localities served by the railroads and the motor carriers are, in many instances, different. In fact, the arguments made by the parties indicate that, in most instances, they are different. Evidently few buyers of petroleum products patronize both the railroads and the motor trucks. But the Bureau contends that, notwithstanding the differences of which we have taken notice, the persons and places served by the motor carriers and those served by the railroads are in competition with each other. It urges that a rate unduly low granted by the railroads to petroleum users is prejudicial even to persons served only by the motor carriers. It does not confine that argument to places and persons which are actually competitive, but extends it to all places and persons equidistant from the place of origin of the shipments.

In making its attack upon the aforementioned tariffs, the complaint presented by the Bureau to the Commissioner alleged that the new rates "constitute substantial reductions below the previously existing rates.  *  *  *  Such reduced rates are unjust and unreasonably low and they are not compensatory; have caused and will continue to cause substantial and undue loss of revenue to complainant's members and to other rail carriers  *  *  *; and do not contribute a fair share towards the revenue of the defendants." The following is the detailed information which the complaint submits:

"That the subject rates result in extremely low revenues considering the character of the commodities, for example, typical examples reflect the following car-mile earnings and ton-mile earnings:

| Origin | Desti-nation | Mile-age | Car-Mile Earnings | | Ton-Mile Earnings | |
|--------|----------|--------|-------------------|----------|-------------------|----------|
| | | | Subject Rates | Pre-vious | Subject Rates | Pre-vious |
| | | | Cents | Cents | Mills | Mills |
| Portland | Klamath Falls | 636 | 34.0 | 43 | .00125 | .00165 |
| Portland | Medford | 650 | 27.6 | 37.4 | .0010 | .0014 |
| Coos Bay | Klamath Falls | 632 | 34.7 | 41.8 | .0013 | .00155 |
| Coos Bay | Medford | 654 | 27.5 | 37.2 | .00105 | .0014 |

Note: The above mileages reflect an empty movement in the reverse direction as there is no return haul. Previous rates from Portland-Coos Bay were: 52¢ to Klamath Falls, 46¢ to Medford, subject rates are 41¢ and 34¢ respectively. The above are predicated upon 8,000 gallons at 6.6 lbs. per gallon.

"That the subject commodities are relatively high grade among the multitude of commodities transported by defendant railroads; that average system ton mile earnings of the Southern Pacific Company as reported in its annual report for 1950 was 14 mills and the average system car mile earnings for the same year, as shown in the same report was 35.87 cents; hence, the earnings on the

subject rates as shown above are below the average system earnings and the rates are less than minimum reasonable rates.''

Further, according to the complaint filed with the Commissioner,

''the subject rates if met by the motor carriers would result in revenues averaging approximately 28 cents per mile as against operating costs of from 33 cents per mile to 37 cents per mile, depending upon the carrier and its volume of business; that, hence, it is apparent that shippers and receivers at off-rail bulk plants even though adjacent to or near on-rail plants are presently penalized and discriminated against by virtue of the rates herein complained of.''

On behalf of a concern entitled Oil Terminals Company, which constructed the oil storage tanks in Crescent City which we mentioned, a statement was presented which alleged:

''From the bulk storage facilities at Crescent City, motor common carriers transport the refined petroleum products to points in Southern Oregon. Bulk storage facilities are maintained by oil companies in the Portland, Oregon area. The cost to the oil companies of transporting petroleum products by tank steamers to Portland and thence distributing to Southern Oregon by rail or truck is compared by said oil company shippers with the cost via the combined barge-truck operation between San Francisco Bay points and points in Southern Oregon via Crescent City. The reduced rail rates, therefore, threaten to cause a diversion from the barge-truck service via Crescent City to the rail service from Portland to Southern Oregon. Any such diversion will impair the operation of petitioners, particularly of petitioner Oil Terminals Co., since the cost of maintaining the bulk storage facilities at Crescent City is practically constant re-

gardless of volume and, should the volume be reduced by reason of reduced rail rates, the cost will so exceed revenue as will ultimately make continuation of such facilities impractical or impossible.''

The Acme Transportation, Inc., a motor carrier which distributes oil from the Crescent City storage tanks to points in California and Southern Oregon, alleged:·

"That if the rates which are the subject of this proceeding are permitted to remain in effect, they will materially affect the rate structure between California and Oregon and will seriously and adversely affect petitioner's business. That the rates under attack are unjust, unreasonable and unlawful, and that they are unduly low.''

The respondents (the Commissioner and the Bureau) contend that § 113-140, OCLA, which is now ORS 760.510, 760.515 and 763.170, authorized the Bureau to present, and the Commissioner to consider, the complaint which we just reviewed. In their efforts to show that the lowered rates are unjust and unreasonable, the respondents depend upon § 113-103, OCLA (ORS 760.015). They base their claim that the rates are discriminatory to a particular description of traffic (petroleum products) upon § 113-125, OCLA (ORS 760.175).

When the complaint was set for a hearing by the Commissioner, the railroads objected that he lacked jurisdiction to hear the cause. They argued that the Commissioner has no jurisdiction to revise rates upwards over the protests of the carrier that filed the tariff. Upon rejection of the contention, the railroads instituted this suit. After a hearing on the return to the alternative writ of prohibition, the circuit court set aside the writ and dismissed the proceeding. The

court was of the belief that a rate which is not compensatory is an unjust charge within the contemplation of § 113-103, OCLA (ORS 760.015) and that such a charge subjects the descriptions of traffic to which it is applicable to undue and unreasonable prejudice in violation of § 113-125, OCLA (ORS 760.175). The court, in making the ruling, expressed the belief that "the common law writ of prohibition is an available remedy in Oregon." No evidence was taken in the circuit court. The latter's ruling was based upon the petition for the writ, the return thereto and the other documents which we have mentioned. They showed the facts indicated above. The foregoing suffices for present purposes as a statement of the facts and the contentions.

The availability in Oregon of prohibition has not been made the subject of cross-appeal. The respondent Commissioner explains that since the circuit court's order of dismissal was in favor of the respondents, they could not cross-appeal had they wished to do so. The Commissioner makes it clear that he is in accord with the circuit court's holding that the remedy of prohibition is obtainable in Oregon. The brief which he filed in this court terms the writ a "salutary device * * * an integral part of effective judicial process." Anticipating that possibly someone might argue that the writ is not a part of Oregon procedure, the Commissioner's brief says that "a disservice would be done should such an argument find favor with this court."

The Commissioner's brief delivers an effective argument in behalf of prohibition; it begins with this statement:

"While there is no specific statutory authorization for the issuance of the writ, a reasonable con-

struction of Art. VII Sec. 9 (Orig.) Oregon Constitution together with Sec. 13-715, O.C.L.A., in the proper common law setting indicates that it was intended that the writ continue in existence.''

The other respondent (the Bureau) does not question those views.

No express provision is made in our statutes for the writ of prohibition which is commonly classified as an extraordinary remedy. This court has never been called upon to determine whether or not the remedy is a part of the judicial machinery of this state.

The following has often been described as a good definition of prohibition and a delineation of its purposes:

> ''The object of this writ is to prevent an inferior tribunal from usurping a jurisdiction with which it is not legally vested, or, to put it in another form, it issues only to restrain the acts of an inferior tribunal exercising some judicial power which it has no legal authority to exercise at all. A writ of prohibition is an extraordinary writ issuing out of a court of superior jurisdiction, and directed to an inferior court or some other inferior tribunal exercising some judicial or quasi judicial power, commanding it to cease entertaining jurisdiction of a cause or proceeding over which it has no control, or where such inferior tribunal assumes to entertain a cause over which it has jurisdiction, but goes beyond its legitimate powers and transgresses the bounds prescribed to it by law.''

*State v. Ward,* 70 Minn 58, 72 NW 825.

According to 42 Am Jur, Prohibition, § 1, p 138:

> ''Prohibition is a common-law writ, of ancient origin. It seems to have originated in the early conflict between church and state, and eminent Eng-

lish authorities refer to the use of writ by the royal court against ecclesiastical judges at a very early period. It was in use as early as the twelfth century, since Glanville considers it in his treatise of 1189, * * *."

We have mentioned the fact that prohibition is an extraordinary remedy.

"It is a rule, generally speaking, that its issuance is justified only by express necessity—the necessity created when there is a grievance which cannot be redressed by ordinary proceedings at law or in equity."

Ferris, Extraordinary Legal Remedies, § 307.

According to Glanville, the function of prohibition was to preserve the king's prerogative. It was originally issued only by the King's Bench and was directed to other tribunals directing them to cease hearing causes which were properly heard only in the court of King's Bench. Later, when the writ was also issued by the chancellor, it was returnable to the King's Bench only. Still later the prerogative aspect of the writ diminished as the jurisdiction of the earlier rival courts was better defined and thereupon the remedial nature of the writ was expanded.

High, Extraordinary Legal Remedies, 3d ed, § 764a, says:

"The appropriate function of the remedy is to restrain the exercise of unauthorized judicial and quasi-judicial power, which is regarded as a contempt of the state sovereign, and which may result in injury to the state or to its citizens."

The following is taken from Spelling, Injunctions and Other Remedies, 2d ed, § 1717:

"Injunction never questions the jurisdiction, nor is addressed to the court; it only lies against the

parties. Prohibition on the contrary takes no notice of the parties, ignoring for the most part any interest they may have in the matter forming the subject matter of the grievance and goes direct against the court."

The authorities are in accord that the writ must be based on the absence of jurisdiction in the tribunal which is under attack. They are agreed that that is the only attack which the writ can make upon the action taken below. High, supra, § 767. The conditions for the issuance of the writ are stated by the authority just mentioned as follows (§ 764a):

"Three conditions are necessary to warrant the granting of the relief: First, that the court, officer or person against whom it is sought is about to exercise judicial or quasi-judicial power; second, that the exercise of such power is unauthorized by law; third, that it will result in injury for which no other adequate remedy exists."

*Ashley v. Wait*, 228 Mass 63, 116 NE 961, 8 ALR 1463, referring to prohibition, declares:

"* * * The principles which govern the issuance of that extraordinary writ are well settled. It will not be granted if the court or tribunal against which it is sought has jurisdiction of the cause or matter which it proposes to adjudicate. Prohibition lies only to restrain a clear excess of jurisdiction about to be committed against one who has not submitted thereto, where there is no other adequate remedy. It does not issue to correct or restrict errors or irregularities of a tribunal which is acting within its jurisdiction, although proceeding improperly in the exercise of that jurisdiction. It can be invoked to prevent a court from exercising a jurisdiction which it does not possess. It will not be granted to remedy the errors of a judicial tribunal acting within its jurisdiction, but lies only

to restrain such tribunal from acting outside its jurisdiction."

See, also, *Kevorkian v. Judges of the Superior Court,* 295 Mass 355, 3 NE2d 742, and *People ex rel. v. Municipal Court of Chicago,* 359 Ill 102, 194 NE 242.

We now quote from *Culver Contracting Corporation v. Humphrey,* 268 NY 26, 196 NE 627:

"*  *  * The remedy is an extraordinary one which lies within the discretion of the court. Although ordinarily employed to restrain a subordinate tribunal from entertaining a cause or proceeding over which it has no jurisdiction (People ex rel. Safford v. Surrogate's Court, Genesee County, 229 N. Y. 495, 128 N.E. 890; People ex rel. Lemon v. Supreme Court of State of New York, 245 N.Y. 24, 156 N.E. 84, 52 A.L.R. 200), it may be exercised also to enjoin a lower court from exceeding its authorized powers in a proceeding over which it has jurisdiction (Quimbo Appo v. People, 20 N.Y. 531; People ex rel. Jerome v. Court of General Sessions, 185 N.Y. 504, 78 N.E. 149). See People ex rel. Livingston v. Wyatt, 186 N.Y. 383, at page 393, 79 N.E. 330, 10 L.R.A., N.S., 159, 9 Ann.Cas. 972. The writ does not issue where the grievance can be redressed by ordinary proceedings at law or in equity or merely to prevent error which may be readily corrected on appeal. People ex rel. Mayor v. Nichols, 79 N.Y. 582; People ex rel. Hummel v. Trial Term, Part 1, 184 N.Y. 30, 76 N.E. 732; People ex rel. Livingston v. Wyatt, supra; People ex rel. Childs v. Extraordinary Trial Term of Supreme Court, 228 N.Y. 463, 127 N.E. 486. It is not available ordinarily as a method of premature appeal. Nevertheless, where the lower court is exceeding its jurisdiction and the writ or order furnishes a more effective remedy, it may be availed of although the error might be corrected by appeal. The case at bar comes well within this rule."

For a further discussion of the general nature of prohibition and the circumstances under which it is available, see 26 Georgetown Law Journal 831, the extensive annotation in 111 Am St Rep 929, and *People ex rel. v. Municipal Court of Chicago*, 359 Ill 102, 194 NE 242.

In *Quinby v. Public Service Commissioner*, 223 NY 244, PUR 1918D 30, 119 NE 433, 3 ALR 685, the court, after declaring, "In the absence of clear and definite language, conferring without ambiguity, jurisdiction upon the Public Service Commission to increase rates of fare agreed upon by the street railroad and the local authorities," the Commission had no jurisdiction to grant increases, held that "prohibition is the proper remedy." Accordingly, where an administrative tribunal lacks statutory authority for the course in which it proposes to engage, prohibition, if otherwise available, may be the appropriate remedy.

Constitution of Oregon, Art VII, § 1, says:

"The judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law."

That provision, which vests in this court the judicial power, is similar to Constitution of United States, Art III, § 1.

In view of the absence of any mention of prohibition in Oregon statutes, we must determine whether the remedy nevertheless exists in this state. It is beyond question that some powers of the courts may be curtailed by the legislature. For example, the writ of injunction has been noticeably restricted in recent years as a remedy in some kinds of cases. According to the official annotator of the Constitution of the United States, courts have generally adopted the view

that writs must have some statutory authority. See Constitution of United States, Annotated, 1952, p 522. Against this we have the theory of "inherent" power of the courts to make effective their jurisdiction.

■■ We have taken notice of Art. VII, § 1, Constitution of Oregon. That provision, according to *Thompson v. Multnomah County,* 2 Or 34, "affirms the common law." Prohibition, as we have seen, was a part of the ancient common-law procedure. A holding directly to that effect, which traces the writ into antiquity, is *Carpentertown Coal & Coke Co. v. Laird,* 360 Pa 94, 61 A2d 426. See, to the same effect *Ex parte Cross,* 247 Ala 85, 22 So2d 378, and *Ferguson v. Ferguson* (Tex), 98 SW2d 847. Original Article VII, § 9, Constitution of Oregon, and § 13-715, OCLA (ORS 1.160) may well afford additional legislative background for the issuance of a writ of prohibition. The former "vests the circuit court with supervisory control over all inferior courts." *Yankey v. Law,* 71 Or 58, 142 P 336. Since the writ of prohibition is directed solely at the unwarranted exercise of judicial or quasi-judicial power when no justification therefor exists, we think that, in the absence of express legislative denial, a holding is demanded that the writ is available in this state as a means whereby a superior court may confine inferior tribunals to the powers which they actually possess.

Having expressed our belief that prohibition is available in this state and having described the conditions which are necessary for its exercise, we shall now determine whether or not conditions exist in this case that are essential to the issuance of the writ.

■ The respondents contend that since the railroads could challenge by appeal any order adverse to them which the Commissioner might enter at the con-

clusion of the hearing, the availability of appeal denies to them the remedy of prohibition. The manner of challenging in the circuit court an order entered by the Commissioner is by a suit against the Commissioner. See §§ 112-454 and 112-4,119, OCLA (ORS 757.565 and 756.580). The suit is tantamount to an appeal. The authorities recognize that appeal is sometimes sufficient to render prohibition unattainable. "Like all other extraordinary remedies, prohibition is granted only in cases where the usual and ordinary forms of remedy are insufficient to afford redress." High, supra, § 770. The same authority, in § 771a, continues: "If, however, it is manifest that an appeal from the action of the court would afford an inadequate remedy the right of appeal does not, of itself, afford sufficient ground for refusing relief by prohibition."

"The general rule is that the extraordinary writ of prohibition will not issue when the ordinary and usual remedies provided by law, such as appeal, writ of error, certiorari, or other modes of review, are adequate and available. In some jurisdictions it is held that the remedy by appeal, or in the ordinary course of the law, is the true test in all cases, and not the mere question of jurisdiction or lack of jurisdiction; and that this is a principle which lies at the very foundation of the law of prohibition. However, if want of jurisdiction is disclosed on the face of the petition, that is, when it clearly appears that the inferior court has no jurisdiction of the subject matter, or of the parties, then the writ may be awarded notwithstanding respondent may have jurisdiction in proper cases. This is so for the obvious reason that if such a proceeding should be permitted to go to judgment it would not support an appeal, for it would be coram non judice. Whenever it appears that under no conceivable circumstances could the inferior court render a valid judgment because of a lack of jurisdiction, such as

defective service, it would seem that the discretion should be exercised in favor of issuing the writ, to the end that litigants may be saved the needless trouble and expense of prosecuting their litigation to a fruitless judgment. It should be remembered, that even though there be another legal remedy, the issuance of the writ may still be regarded as discretionary, at least to the extent of determining whether the remedy is adequate.

"It is equally true that the existence of another remedy, to be a bar, must be adequate. There is no general rule by which the adequacy or inadequacy of a remedy can be ascertained, but the question is one to be determined upon the facts of each particular case. The ordinary means that will defeat the application for the writ must be sufficient to afford the relief the case demands. The ordinary remedy available must be adequate to the exigency of the situation. The adequacy or inadequacy of the remedy in the ordinary course of law does not depend merely upon the question of delay, expense or inconvenience. There must be something in the nature of the act or proceeding that makes it apparent to the superior court that it will not be able to protect the rights of the litigants or afford them adequate redress other than through the exercise of this extraordinary jurisdiction, it being the policy of the law that cases shall come to the supreme court but once, and that the decision of such court shall be on the merits of the entire controversy.''

Ferris, Extraordinary Legal Remedies, §§ 322 and 323.

As stated in a preceding paragraph, the railroads at once objected when the Commissioner announced an intention to conduct a hearing upon the complaint which the Bureau had filed. The objections were timely. Presently they were rejected. Thus the railroads embraced the procedure which many courts deem essential to the later prosecution of a suit for prohibi-

tion. *State ex rel. Poston v. District Court,* 31 Wyo 413, 227 P 378, 35 ALR 1082 annotated.

■ Disregarding the expense which the railroad would incur incidental to a hearing conducted by the Commissioner, the remedy by appeal from an order of the Commissioner adverse to the railroads would be inadequate. Section 113-150, OCLA (ORS 760.575) provides that an order of the Commissioner shall be effective until reversed or modified upon appeal. Unlike the usual effect of an appeal, the order is operative after its entry and until set aside upon appeal, assuming that it would be eventually set aside. It is true that § 112-455, OCLA (ORS 757.570 and 757.580) and § 112-4,120, OCLA (ORS 756.590) grant the circuit court discretionary power to stay, pending appeal, the operation of an order issued by the Commissioner. The latter of the two sections uses these words, "upon the giving of such bond or other security, or upon such conditions as the court may require". It adds that the "bond shall be executed in favor of the commissioner for the benefit of whom it may concern and may be enforcible by such commissioner, or any person interested in an appropriate proceeding." Section 112-455, OCLA, which is in similar vein, renders the utility and the surety liable "for all damages caused by the delay in the enforcement of the order of the commissioner." Further, it says:

"No appeal to the supreme court shall stay the operation of any order of the commissioner unless the circuit or supreme court shall so direct, and unless the public utility so appealing shall give a bond with like conditions and terms as that given on granting injunctions suspending an order of the commission fixing rates."

The court's power upon appeal to stay the operation of the Commissioner's order is a discretionary one

*(State ex rel. v. Duncan,* 191 Or 475, 230 P2d 773) and mandamus will not issue to control the exercise of the discretionary power *(State ex rel. v. Duncan,* supra).

From the above we see that the remedy of appeal is not available to a railroad or other public utility until the Commissioner has exercised the questioned power, has conducted a hearing and has issued an order. Appeal does not enable a railroad to obtain a ruling from the courts as to the Commissioner's jurisdiction until after the Commissioner has issued an adverse order. The latter has immediate effect. In contrast to that situation, prohibition offers a means whereby the Commissioner's power to make a contemplated order can be determined before he exercises his challenged power. For the purpose of carrying our analysis further, let us now assume that prohibition is denied in this case, and that thereupon the Commissioner conducts a hearing into the reasonableness of the railroads' challenged tariffs, culminating eventually in the issuance of an order which sustains the attack made upon the tariffs by the Bureau. Let us also assume that the Commissioner's order commands the railroads to increase materially their rates. If upon that juncture the railroads asked for judicial review of the legality of the Commissioner's order they could petition the court to grant them the stay authorized by § 112-4,120, OCLA (ORS 756.590). However, their prayer for a stay would be addressed to a discretionary, not a plenary, power. If the court exacted from the railroads a bond "for the benefit of whom it may concern  *  *  *  enforcible by said commissioner, or any person interested" as a condition to granting a stay, no imagination is required to make one realize the momentous liability which the bond would represent. As we have seen, 21 motor carriers which

belong to the Bureau are engaged in the transportation of petroleum products in this state. If the court, after judicial review of the Commissioner's order, affirmed its validity and the motor carriers instituted action upon the stay bond, the consequences to the surety and to the railroads could be grave. Of course, if the tariffs which the railroads have filed with the Commissioner are unwarranted, the railroads, and not the motor carriers, should suffer the consequences. But that is not the issue before us. The present issue is this: Is appeal as adequate a remedy in instances of this kind as prohibition.

We think that the above analysis shows that prohibition can serve the purpose of justice in this case much more effectively than appeal. In making that statement we have not lost sight of the fact that prohibition, if abused, may be employed as a means of arresting hearings and investigations which the Commissioner may wish to conduct in the performance of his duties. When improvidently issued, the writ can render the Commissioner's power impotent. But the writ is not available to anyone as a matter of right, but only of discretion. By discretion is meant that a court should approach the issuance of the writ with the same caution, circumspection and concern for consequences as is exercised by a prudent person who is about to engage in an undertaking which may involve the interests of many people in serious sequels. Piecemeal decision of rights and of cases should generally be avoided. That is an axiom which should not be forgotten when it is sought to thwart an investigation by a writ of prohibition. Also worthy of consideration is the fact that the power which the Commissioner proposed to exercise when he met with the writ is one which has been the subject of very little judicial de-

cision over the years, except in instances where the power was conferred by unambiguous statutes. In this state our legislation which regulates railroads and invests the Commissioner with his power had its genesis in 1907, yet there is a dearth of utterances by this court upon the question as to whether or not the Commissioner can order a railroad, against its will, to increase a tariff which it has filed. Obviously, the issue as to whether or not the respondent Commissioner has power to compel a carrier to increase its rates is one of importance to the official, to all public utilities and to the people themselves. If the railroads which are parties to this case cannot lower their rates when they believe that necessity so demands, they may sustain grave injury pending the hearing and subsequent litigation with the Commissioner, in the event that he issues an order adverse to them.

The circumstances of which we have taken notice persuade us that this is a proper case for prohibition. Being so satisfied, we will not pass on to the other phase of the case; that is, to the question as to whether or not the. Commissioner has the power to compel a railroad, against its will, to charge a larger sum than that entered in a tariff which it employed.

In their brief the railroads make three contentions: (1) The Commissioner has no power to fix minimum rates; (2) the rates entered in the challenged tariffs could not possibly be in violation of § 113-125, OCLA (ORS 760.175) under the facts developed in the record; and (3) the Commissioner could not entertain the complaint submitted by the Tariff Bureau because its members are not in the class protected by the statutory provisions which we have mentioned.

██ Since this case is one of prohibition, the question of whether or not the Bureau was a proper party

to lodge a complaint with the Commissioner is not properly cognizable. Further, prohibition is not concerned with every defect in jurisdiction, but with the power of the judicial or quasi-judicial body to act at all.

The original railroad act was adopted in this state in 1907. See Oregon Laws 1907, ch 53.

The complaint before the Commissioner was brought under § 113-140, OCLA (ORS 760.510, 760.515 and 763.170). The following are the parts of that section which are material to our purpose:

"Upon complaint of any person, * * * that any of the rates, fares, charges, or classifications, or any joint rate or rates are in any respect unreasonable or unjustly discriminatory, * * * the commission [commissioner] may proceed to investigate the same as hereinafter provided for.

"If upon such investigation the rate or rates, fares, charges, or classifications, or any joint rate or rates, or any regulation, practice or service complained of shall be found to be unreasonable or unjustly discriminatory, or the service shall be found to be inadequate, the commission [commissioner] shall have power to fix and order substituted therefor such rate or rates, fares, charges or classification as it shall have determined to be just and reasonable and which shall be charged, imposed and followed in the future, * * *. No complaint shall at any time be dismissed because of the absence of direct damage to the complainant."

The sections of our laws which define the terms "unreasonable" and "unjust discrimination" and upon which the Bureau relies are §§ 113-103 and 113-125, OCLA (ORS 760.015 and 760.175). They are, respectively:

"Every such railroad is hereby required to furnish reasonably adequate service, equipment and

facilities, and the charges made for any service rendered or to be rendered in the transportation of passengers or property or for any service in connection therewith, * * * shall be reasonable and just, and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful." § 113-103.

"If any railroad shall make or give any undue or unreasonable preference or advantage to any particular person, firm or corporation, or shall subject any particular person, firm or corporation, or particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever, such railroad shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared unlawful; * * *." § 113-125.

■ The power which the Commissioner has is that given by the legislature. He has no other. The fact that the Commissioner has been given some power to act in some areas of utility regulation does not imply that he may exercise all the power that the legislature might have exercised had it chosen to act directly. Even though there may be a general belief abroad that conditions have greatly changed since the year 1907 and that present day conditions call for the exercise of greater powers, the legislative grant cannot be enlarged other than by the legislature. It is for this court to determine what power the legislature has granted, not what the legislature might grant. The issue is then whether the Commissioner has the power to prescribe a minimum rate for a particular description of traffic.

Nothing in § 113-140, OCLA (ORS 760.510, 760.515 and 763.170) apparently limits the power of the Commissioner to alter rates upward or downward when he finds that a tariff filed by a carrier imposes an un-

reasonable or unjust discrimination, fare, charge or classification. Standing alone, this section gives the Commissioner, when he has found a violation of the act, the power to increase or decrease rates so as to make them reasonable and nondiscriminatory. Therefore, if a reduction by a railroad of the rate upon a classification of traffic constitutes an unjust discrimination or must be deemed unreasonable, it is our duty to affirm the trial court, as the Commissioner would then have jurisdiction to determine whether such unreasonableness or discrimination does, in fact, exist.

The words "unreasonable" and "unjust discrimination" cannot be given a subjective meaning in a statute. The legislature did not and could not have meant that a rate was illegal and thereby subject a railroad to criminal sanctions if someone had a sincere conviction that the rates were "unreasonable" or "unjustly discriminatory". That someone may feel injured or actually be injured by a tariff cannot furnish the test or content of the words. There are no rights that a citizen may exercise without prejudicing someone. When a voter goes to the polls and votes for his choice, the latter's opponent is injured by having his opportunities lessened. If a man goes to work to provide the necessities of life for his family, another is prevented from possessing that job. When a carrier is entrusted with the transportation of a shipment of goods, competing carriers are denied that item of business. The rights enjoyed furnish the test of, but not the injury sustained.

What, then, is the meaning of "unreasonable" and "unjust discrimination"? Webster's New International Dictionary, 2d ed, defines "unreasonable" as "not conformable to reason, irrational; * * * Be-

yond the bounds of reason or moderation; immoderate, exorbitant.'' ''Discrimination'' is given the following meaning by the same authority: ''A distinction, as in treatment; esp., an unfair or injurious distinction. Specif., arbitrary imposition of unequal tariffs for substantially the same service; the difference in treatment may be between persons, localities or class of traffic, in respect of substantially the same service.''

■ The words must be taken in view of the political, economic and social ideas that prevailed at the time of the enactment of the statutes. Amendments and rejected amendments must be viewed as of the time of their consideration, and the act as a whole must be considered throughout the period of amendment as representing the legislation which the legislature believed this state needed.

■ The political, economic and social convictions that prevailed at that time, and we think now also, were and are based upon a conviction that our people should have the maximum liberty to pursue their own affairs. The limits were drawn where the exercise of individual volition encroached upon the equal rights of another. Government was regarded as a means of protecting those rights, but not as a device whereby every individual should be subordinated to a function. No purpose was entertained to achieve the perfect state of social equality and organization which is exemplified in an ant or bee colony. Neither the Constitution of the United States nor that of Oregon is a mere collection of anachronisms of a discarded philosophy. Our constitutions are more than the frameworks of governments. They establish and guarantee rights which they place beyond the power of a temporary majority, parliamentary or otherwise, to abridge.

We have seen that § 113-103, OCLA (ORS 760.015) provides:

"Every such railroad is hereby required to furnish reasonably adequate service, * * *, and the charges made for any service rendered or to be rendered in the transportation of passengers or property * * *, shall be reasonable and just, and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful."

Section 1 of the Interstate Commerce Act of 1887 read as follows:

"All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, or for the receiving, delivering, storage, or handling of such property, shall be reasonable and just; and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful."

It will be observed that both acts say "charges made for any service rendered or to be rendered in the transportation of passengers or property, * * * shall be reasonable and just; and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful."

In 1888, 19 years before our legislative assembly adopted our act containing the provision which we just quoted, an issue substantially similar to the one now before us was resolved in a carefully prepared decision of the Interstate Commerce Commission entitled *In re The Chicago, St. Paul & Kansas City Railroad Company,* 2 Interstate Commerce Commission Reports 231. The chairman of the Commission at that time was Judge Thomas M. Cooley. Judge Cooley was the author of the opinion. From it we quote the following:

"First of all, in taking up the case, we direct attention to the claim advanced on behalf of re-

spondent, that the rates made by the Chicago, Burlington and Northern are unreasonable and unjust, because they are too low to be remunerative, and that they are, therefore, illegal under the Act, which requires all charges to be 'reasonable and just,' and declares 'every unjust and unreasonable charge' to be unlawful.

\* \* \* \* \*

"This question of authority, now for the first time presented to the Commission, is raised upon the express words of the statute which declare that 'all charges shall be reasonable and just.' To be so the charges ought to be fair to both parties; to the carrier as well as to the party it serves; the rights and interests of both should be considered. There is consequently no little force in the claim made by respondent that charges are not reasonable and just when they are so low as to be unremunerative to the carrier; so low that its action in continuing to make them would lead directly to bankruptcy. Possibly, if the statute were to be interpreted without any aid from its history, and with no other knowledge of its purposes, aims and ends than such as may be derived from its provisions, a holding that a rate unreasonably low was forbidden might be justified, or at least might be urged upon plausible arguments.

"But every statute is to be read in the light of its history and of the evils it was intended to redress. And as a matter of public history nothing can be more notorious that that the Act to regulate commerce had for its leading and general purpose, to which other purposes were subordinate, to provide effectual securities that the general public, in making use of the means of railroad transportation provided by law for their service, should have the benefits which the law had undertaken to give, but of which in very many cases it was found the parties entitled to them were deprived by the arbitrary conduct, the favoritism, or the unreasonable exactions of those who managed them. It may be af-

firmed with entire confidence that the Act was not passed to protect railroad corporations against the misconduct or the mistakes of their officers, or even primarily to protect such corporations against each other. The Act does, indeed, require them to afford reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, but even this requirement was for the public benefit more particularly than for the benefit of the carriers themselves. Everywhere in the Act the primary purpose apparent in its provisions is that individuals dealing in matters of transportation with the carriers regulated by it shall not, in respect to the conveniences the carriers are supposed to offer to the public, be wronged by arbitrary conduct or by favoritism, or be subjected to extortion. It is to this end that the Act declares that all charges made by the carriers it regulates shall be reasonable and just, and the purpose of the declaration is to establish the rule that the charges shall not be extortionate.

"If such was the primary purpose of the statute, as unquestionably it was, then the proper meaning of the terms 'just and reasonable' as employed in it is apparent. They were employed to establish a maximum limitation for the protection of the public, not a minimum limitation for the protection of reckless carriers against their own action. That a minimum limitation was not in the mind of Congress we may easily satisfy ourselves by considering what would have been the probable fate of any distinct proposition to confer upon the Commission the power which it is now urged to assume. There is not the least reason to suppose that any such proposition would have been seriously entertained in Congress, or that it could have received any considerable support. It would on the other hand, in all probability, have been promptly rejected as wholly unnecessary for the protection of those who had complete powers of protection in their own hands, and as being little short of impertinent inter-

meddling. If such would have been the fate of the proposition expressed in plain terms, then the conclusion is unavoidable, that the general terms made use of in the statute do not confer the power the proposition would involve. We cannot as a matter of construction deduce from the general terms of a statute a legislative intent which there is no reason to suppose existed in fact, but which on the other hand the circumstances all tend to show was not suggested when the law was under consideration, and if it had been suggested would have been received with no favor.''

The foregoing is convincing evidence that the purpose of the act which created the Interstate Commerce Commission was not ''to protect railroad corporations against the misconduct or the mistakes of their officers, or even primarily to protect such corporations against each other.'' In developing the meaning of the phrase ''just and reasonable'', Judge Cooley engaged in an observation so germane to the issue now before us that we will quote it again:

''They were employed to establish a maximum limitation for the protection of the public, not a minimum limitation for the protection of reckless carriers against their own action. That minimum limitation was not in the mind of Congress we may easily satisfy ourselves by considering what would have been the probable fate of any distinct proposition to confer upon the Commission the power which it is now urged to assume.''

He declared that if such a proposition had been made, it would not have been ''seriously entertained in Congress'', but would have been spurned as ''little short of impertinent intermeddling.''

According to *Hammond Lumber Co. v. Public Service Commission,* 96 Or 595, 189 P 639, our statute was

patterned upon a measure adopted in Wisconsin. In 1908 *Minneapolis, St. P. & S. Ste. M. Ry. Co. v. Railroad Commission*, 136 Wis 146, 116 NW 905, 17 LRA, NS 821, analyzed at length the powers over rates and service which were entrusted by the Wisconsin act to the railroad commission created by it. The majority opinion, which was written by Justice Timlin, contained this passage:

> "In the absence of any action by the Railroad Commission the railroad may fix rates, but not above the maximum therein provided."

Justice Marshall of the court wrote a specially concurring opinion in which one other member concurred; it said:

> "The legislative scheme embodied in the act, as I understand was conceded upon the argument, is not to take control of railroad property and business from the proprietors, but to supervise the same so as to prevent extortion and injustice and secure fairly adequate service. It contemplates, as I think, that so long as a rate for service is not extorionate or service afforded is fairly adequate the proprietors shall not be interfered with.  *  *  *
>
> "Further, it would seem that in case of the commission dealing with inadequate service it should require such additional service as to remove the element of injustice, affording, in the whole, the minimum of what is reasonable, leaving proprietors free and opportunity to give additional service. In case of the commission dealing with extortionate rates for service it should remove the element of injustice by reducing the rates sufficiently to measure the excess, leaving the proprietors free and opportunity to make further reductions."

We are aware of nothing in any previous ruling by this court which is out of harmony with the statements which we copied from the two decisions just reviewed.

The respondents' brief quotes extensively from *Port-land Railway, Light & Power Co. v. Railroad Commission*, 56 Or 468, 105 P 709, 109 P 273. See the same case: 229 US 397, 57 L ed 1248, 33 SCt 820. That decision did not hold that this state's regulatory agency has power to prevent a carrier from lowering a rate. The agency, in the instance before this court in that case, after finding that the fares charged by the carrier for two hauls of approximately equal length were different and that the lower of the two charges was reasonable, ordered that the higher charge should be reduced to the amount of the lower.

The statute adopted by our legislative assembly in 1907 for the regulation of railroads has been little changed since its enactment. In 1941, while this court was considering *Union Pacific Railroad Co. v. Bean*, 167 Or 535, 119 P2d 575, in which we eventually held that the Public Utilities Commissioner "had no authority to suspend proposed reduced rates" pending appeal, a bill known as Senate Bill No. 213, was introduced before the 1941 legislative assembly which proposed to grant to the Commissioner the power to fix minimum as well as maximum rates. The measure was rejected; see Senate and House Journal, 1941, p 628. The title of that bill was:

> "For an Act to amend sections 113-112, 113-116, 113-140 and 113-149, O.C.L.A., and to provide for the establishment and regulation of maximum and minimum individual and joint intrastate rates, fares, charges and divisions thereof and through routes by railroads."

The bill sought to amend § 113-116 so as to make it read:

> "Whenever there shall be filed with the commissioner by any railroad  *  *  *  any schedule stating a new or changed individual or joint rate

\* \* \* whether by way of increase or reduction, the commissioner shall have and hereby is given authority \* \* \* to enter upon a hearing concerning the lawfulness and reasonableness of such fare \* \* \*.''

The bill sought to amend § 113-140 so as to change its terms into:

"If upon any investigation the rate \* \* \* shall be found to be unreasonable or unjustly discriminatory \* \* \* the commissioner shall have power to fix and order substituted therefor such rate or rates, fares, charges or the maximum or minimum or maximum and minimum thereafter to to be charged \* \* \*.''

The bill attempted to introduce into § 113-149 a similar provision, particularly this:

"The commissioner hereby is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare or charge, or rates, fares or charges to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum to be charged \* \* \*.''

In the 1953 legislative session another effort was made to grant the Commissioner power to prescribe minimum as well as maximum rates. The measure was known as Senate Bill No. 319. The proposal failed. See Senate and House Journal, 1953, p 871. The title of that bill read as follows:

"For an Act relating to rates, fares, charges, classifications, regulations or practices of railroads; providing for suspension of same by the Public Utilities Commissioner; providing for the fixing of maximum or minimum, or maximum and minimum rates, fares and charges; and repealing section 113-116, O.C.L.A.''

The measure sought to repeal § 113-116, OCLA, and in its stead adopt a provision granting to the Commissioner amplified powers, including this:

> "The commissioner hereby is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate * * * to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged * * * and to make an order that the carrier or carriers * * * shall not thereafter publish or demand or collect any rate, fare or charge for such transportation other than the rate, fare or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed as the case may be."

Thus two efforts to grant to the respondent Commissioner specifically the powers, which it is now asserted he possesses, were defeated. We do not believe that the two rejected bills represented nothing more than restatements of existing law.

Upon the national scene the course of events has been materially different. The Interstate Commerce Act has been amended several times. In 1920 Congress adopted the measure known as the Esch-Cummins Act (41 Stat 456) which gave the Interstate Commerce Commission power to prescribe "maximum or minimum, or maximum and minimum" rates to be charged by carriers. It will be recalled that in 1888 Judge Cooley, in writing the opinion in *In re Chicago, St. Paul & Kansas City Ry. Co.*, supra, declared that if an effort had been made to include in the Interstate Commerce Act when it was presented to Congress a provision giving the Commission control over minimum rates, the attempt would have been defeated as "impertinent intermeddling." Virtually a third of a century had to pass before a proposal to confer upon

the Commission power over minimum as well as maximum rates could succeed. In that period the Commission gained in public favor and came to be regarded as a very useful arm of the government. In the meantime, the carriers, which at the outset had viewed the Commission with ill-concealed disfavor, had become domesticated and had decided that, in lieu of opposing the Commission, they would live with it.

Notwithstanding the fact that Congress conferred power over minimum rates upon the Interstate Commerce Commission in 1920, 21 years later, as we have seen, our legislature declined to grant similar power to our regulatory agency, and 33 years later again refused to do so. In 1933, when our legislative assembly adopted the measure which subjected motor carriers to regulation by the Public Utilities Commissioner (Oregon Laws 1933, Special and Regular Session, Ch 429), it did not include within the statement of the Commissioner's power over rates the phrase, "maximum or minimum, or maximum and minimum to be charged" or any equivalent thereof. See, also, Oregon Laws 1933, Second Special Session, Ch 49, and Oregon Laws 1935, Ch 277, which amended the original enactment.

Frequently the rejection of a proposed amendment is deemed by the rules governing statutory construction as evidence of a legislative interpretation of the existing law. The courts cannot, however, always discern safely the reasons which persuaded legislative assemblies to reject measures, especially not if the amendatory act contains provisions dealing with several different subjects. The present instance, however, is one in which it seems safe to discern, in the defeat of the amendatory bills, the attitude of the legislature. The two rejected bills were separated from one another

by a long span of years. Each of the disapproved measures contained language borrowed verbatim from an amendment to the Interstate Commerce Act. The second of the unsuccessful measures was confined largely to minimum rates. Further, the omission of the legislature to have included in the act which subjected motor carriers to regulation the clause "maximum or minimum, or maximum and minimum" strengthens the evidence afforded by the rejection of the amendments. From *State v. Chicago & N. W. Ry. Co.*, 147 Neb 970, 25 NW2d 824, we take the following:

"* * * That the Legislature intended the distinction made is evident from the further fact, appearing in the record, that the Legislature was urged to amend the act at the 1945 session of the Legislature to permit the use of reflectorized lamps. See L.B. 357, 1945 session, proposed and indefinitely postponed. Its refusal to amend the statute is evidence of a legislative intent to maintain the act in accordance with the interpretation which we here place upon it."

We are satisfied that the rejection of the two amendatory bills is evidence that the legislature did not wish the respondent Commissioner to have power over minimum rates. See, also, 82 CJS, Statutes, § 360, p 790, and 50 Am Jur, Statutes, § 330, p 322.

In 1940 Congress codified the acts regulating railroads, water carriers and motor carriers. See 54 Stat.L. 898. In making the codification it included in the enactment the following policy statement:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, eco-

nomical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.''

One of the sections of the act reads, in part as follows:

''It shall be the duty of the Board to investigate—

(1) the relative economy and fitness of carriers by railroad, motor carriers, and water carriers for transportation service, or any particular classes or descriptions thereof, with the view of determining the service for which each type of carrier is especially fitted or unfitted; the methods by which each type can and should be developed so that there may be provided a national transportation system adequate to meet the needs of the commerce of the United States, of the Postal Service and of the national defense;

(2) the extent to which right-of-way or other transportation facilities and special services have been or are provided from public funds for the use, within the territorial limits · of the continental United States, of each of the three types of carriers without adequate compensation, direct or indirect, therefor, and the extent to which such carriers have been or are aided by donations of public property,

payments from public funds in excess of adequate compensation for services rendered in return therefor, or extensions of Government credit; and

(3) the extent to which taxes are imposed upon such carriers by the United States, and the several States, and by other agencies of government, including county, municipal, district, and local agencies.''

Washington, to the north, has adopted legislation (§ 10422 Rem Rev Stats) reading as follows:

''* * * Provided, further, that when two or more public service corporations * * * are engaged in competition in any locality or localities in the state either may make complaint against the other or others that the rates * * * of such other or others with or in respect to which the complainant is in competition, are unreasonable, unremunerative, discriminatory, illegal, unfair or intending or tending to oppress the complainant, to stifle competition or to create or encourage the creation of monopoly, and upon such complaint or upon complaint of the commission upon its own motion, the commissioner shall have power * * * to * * * correct the abuse complained of by establishing such uniform rates * * * as shall be found reasonable, remunerative, * * *.''

California, to the south of us, has legislated in similar vein. See Ch 700, Stats 1935, §§ 13½ and 32½ of the California Public Utilities Act. One of its provisions reads as follows:

"No common carrier subject to the jurisdiction of the California Railroad Commission may establish a rate less than a maximum reasonable rate for the transportation of property for the purpose of meeting the competitive charges of other carriers or the cost of other means of transportation which shall be less than the charges of competing carriers or the cost of transporation which might be incurred

through other means of transportation, except upon such showing as may be required by the commission and a finding by it that said rate is justified by transportation conditions."

A further section of the act directs the Commission, whenever it finds that

"any rate or toll for the transportation of property is lower than a reasonable or sufficient rate and that such rate is not justified by actual competitive transportation rates of competing carriers, * * * the Commission shall prescribe such rates as will provide an equality of transportation rates * * *."

If the Commissioner possesses the power which he claims and can compel a carrier, over its protests, to raise its charges so that competing carriers or other forms of transportation will not be forced out of business, his power will be comparable to those possessed by the California and Washington regulatory bodies. Although in those states the power has been given by express legislation, in this state, if we sustain his contentions, the Commissioner will find his source of power in judicial construction.

The power under scrutiny, if it is possessed by the Commissioner, will materially alter the nature of his office. He will not be merely a regulator of rates, but will have some of the powers of a coordinator of transportation. To illustrate what we have in mind, we shall take the present case as an example. According to the complaint which the Bureau presented to the Comissioner, the appellant railroads wish to lower "the character of the commodity" (petroleum) which is the subject matter of the challenged tariffs. The complaint describes petroleum as a "relatively high-grade" commodity. Evidently, since the railroads classify petroleum as a "relatively high-grade" commodity, they

charge more for its transportation than for other items which are not of an equally high grade. We infer from the averments just reviewed that the appellant railroads, in filing the challenged tariffs, propose to charge for the transportation of petroleum rates akin to those of lower grade commodities. Possibly they are prepared to get along with less revenue; or maybe they hope that lower rates will win for them a larger volume, resulting ultimately in greater revenue. If the Commissioner has the power to prevent the railroads from pursuing their intended course, he will have no guidance, in the exercise of his great power, from any enactment of the legislature. The absence of any legislation upon such an important subject is evidence that the power has not be conferred.

■ There can be little doubt that the purpose of our act at the time of its adoption was not (1) to prevent the impoverishment of the railroads by their own improvidence; (2) to integrate the transportation system of this state; or (3) to confer upon the regulatory agency the powers of a coordinator of transportation. The reasons which induced the legislature to enact the measure were to achieve a means whereby the state could cope with some evils which had crept into the operating practices of the railroads. Those evils were of two major kinds: (a) discrimination between shippers whereby the large and important ones were given reduced rates, outright or by rebates, and (b) discrimination against some localities which lacked competing transport facilities.

Railroads are still enterprises conducted by individuals for profit. They are regulated to prevent abuses, not to make the state the manager of their properties. In *Interstate Commerce Commission v.*

*Chicago Great Western Railway,* 209 US 108, 52 L ed 705, 28 S Ct 493, the court said:

"It must be remembered that railroads are the private property of their owners; that while from the public character of the work in which they are engaged the public has the power to prescribe rules for securing faithful and efficient service and equality between shippers and communities, yet in no proper sense is the public a general manager. As said in *Int. Com. Com. v. Ala. Mid. R. R. Co.,* 168 U. S. 144, 172, quoting from the opinion of Circuit Judge Jackson, afterwards Mr. Justice Jackson of this court, in *Int. Com. Com. v. B. & O. R. R. Co.,* 43 Fed. Fep. 37, 50:

" 'Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers, as they were at the common law, free to make special rates looking to the increase of their business, to classifiy their traffic, to adjust and apportion their rates so as to meet the necessities of commerce and of their own situation and relation to it, and generally to manage their important interests upon the same principles which are regarded as sound and adopted in other trades and pursuits.' "

The philosophy of the regulating acts, not only of Oregon but elsewhere, has not been to eliminate competition. It is for this reason that general rate levels are established which may be varied downward to meet competitive conditions. The dealings with particular rates have been to correct discriminations and unreasonable charges rather than to integrate the transport systems. In *Indian Valley Railroad v. United States,* 52 F2d 485, a case involving construction of a new line,

the court, in referring to the Federal Transportation Act of 1920, said:

"Prior to the Transportation Act of 1920, no right constitutional or statutory, existed to protect one railroad from another due to losses incident to competition of competing lines. The Transportation Act of 1920 created no such right; on the contrary, it expressly provided for the entry of a competing carrier into the traffic territory of another carrier, where the commission finds that public convenience and necessity requires new construction."

Even discriminations in charges not commensurate with the distance involved have been upheld in view of the necessity to compete. In *Barringer & Co. v. United States,* 319 US 1, 87 L ed 1171, 63 S Ct 967, the court said:

"It has long been established by our decisions that differences in competitive conditions may justify a relatively lower line-haul charge over one line than another."

■ The term "unreasonable" having the connotation of excessive—the standard being a reasonable return on the property—cannot be applied to a rate because it is not compensatory or because other methods of transport cannot meet it. The regulatory acts do not undertake to underwrite the success of a carrier. As a business proposition, a carrier is on its own. While a carrier cannot be forced to haul at a noncompensatory rate, it may do so if it wishes. The right to earn a reasonable return on its property is its right alone and cannot be claimed by others for their own benefit. It is the nature of competition that some will not fare as well as others.

■ We have mentioned the claim that the lowered rates are discriminatory. Section 113-125, OCLA

(ORS 760.175) specifies two classes of unjust discrimination. A railroad is guilty of unjust discrimination when it (1) makes or gives any undue preference or advantage to any particular person, firm or corporation, and (2) subjects to any undue or unreasonable prejudice or disadvantage any particular person, firm or corporation or any particular description of traffic. Thus the giving of an undue preference or advantage to any particular classification of traffic is not made an unjust discrimination. Even if we were to avoid the clear language of the statute, it could not be inferred consistently with the theory of the act that such a preference was unlawful. As we indicated earlier, the act is designed to prevent abuses, not to substitute public management. While in going out for business a railroad may not give lower rates to particular individuals, it may attempt to induce new business by lowering the rate for a certain kind of freight. The prohibition in the statute is to prevent attempts by a railroad to discourage any particular class of freight by too high rates or inadequate service. Its purpose is to enforce the requirement that a railroad, as a common carrier, accept all reasonable freight which might be rendered ineffective by placing some disadvantage upon that class of freight although nominally standing willing to accept that. In *Valley & Siletz Railroad v. Thomas*, 151 Or 80, 48 P2d 358, it was noted:

> "The Commissioner has a wide range of discretion in the exercise of the power to prescribe reasonable charges, and he is not bound to fix uniform rates for all commodities or to secure the same percentage of profit on every sort of business."

There is no substance to the claim that off-rail points are discriminated against because the trucks cannot meet the railroad rate for equal distances. This

is little more than a variation in the claim that rates are unlawful if trucks cannot meet them profitably. As railroads are not obliged to serve places their lines do not reach, a railroad cannot discriminate against places it does not serve.

We have not in the past lightly inferred merely because a comprehensive system of regulation has been established that, therefore, the power has been given to establish minimum rates or prices. The legislature does not lightly treat such power, nor do we. In *Sunshine Dairy v. Peterson,* 183 Or. 305, 193 P2d 543, this court upheld an injunction restraining the director of agriculture from enforcing an order directing that milk in fiber containers be sold for one cent more than milk sold in bottles. The statute there provided for the fixing of minimum milk prices, wholesale and retail, in four categories. Mr. Justice BRAND, speaking for the court, said: "Standing alone, the grant of power to supervise and regulate the industry, including production, sale, etc., would not authorize price fixing."

Without resort to further analysis, we express our conviction that the act does not authorize the respondent Commissioner to prescribe minimum rates nor to order a railroad, against its will, to increase a tariff which it has filed.

The judgment order of the circuit court which dismissed the proceeding for a writ of prohibition is reversed. The cause is remanded to the circuit court with orders to grant the writ.