216 October 2, 2014 No. 63

IN THE SUPREME COURT OF THE
STATE OF OREGON

Frank GEARHART;
Patricia Morgan;
Kafoury Brothers, Inc.,
*Petitioners on Review,*

*and*

UTILITY REFORM PROJECT,
*Petitioner,*

*v.*

PUBLIC UTILITY COMMISSION OF OREGON
and Portland General Electric Company,
*Respondents on Review.*

(PUC 08487, 09093; CA A140317; SC S061517 (Control))

Frank GEARHART;
Patricia Morgan;
Kafoury Brothers, Inc.,
*Petitioners,*

*and*

UTILITY REFORM PROJECT,
*Petitioner on Review,*

*v.*

PUBLIC UTILITY COMMISSION OF OREGON
and Portland General Electric Company,
*Respondents on Review.*

(PUC 08487, 09093; CA A140317; SC S061518)

En Banc

On review from the Court of Appeals.*

Argued and submitted March 4, 2014.

Linda K. Williams, Portland, argued the cause and filed the briefs for petitioners on review Gearhart, Morgan, and Kafoury Brothers, Inc.

_____
\* Judicial review of an order of the Public Utility Commission, 255 Or App 58, 299 P3d 533 (2013).

Daniel W. Meek, Portland, argued the cause and filed the brief for petitioner on review Utility Reform Project.

Michael A. Casper, Deputy Solicitor General, Salem, argued the cause and filed the brief for respondent on review Public Utility Commission of Oregon. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

James N. Westwood, Stoel Rives LLP, Portland, argued the cause and filed the brief for respondent on review Portland General Electric Company. With him on the brief was Rachel C. Lee.

Scott G. Seidman, Portland, filed a brief for *amicus curiae* Edison Electric Institute.

Katherine McDowell, McDowell Rackner & Gibson PC, Portland, filed a brief for *amici curiae* Avista Corporation, Idaho Power Company, Northwest Natural Gas Company, and PacifiCorp. With her on the brief was Lisa Rackner.

G. Catriona McCracken, Portland, filed a brief for *amicus curiae* Citizens' Utility Board of Oregon. With her on the brief were Sommer Templet and Ray Myers.

BALMER, C. J.

The decision of the Court of Appeals and the order of the Public Utility Commission are affirmed.

**BALMER, C. J.**

At issue in this case is an order of the Public Utility Commission (PUC) that addressed Portland General Electric's (PGE) recovery of its capital investment in the Trojan nuclear generating facility after that facility was retired from service. In that order, the PUC made three key decisions that are now before this court. First, to determine whether a legal error that the PUC had made in an earlier rate case had affected rates that the PUC had authorized PGE to charge, the PUC reexamined those earlier rates. Second, in undertaking that reexamination, the PUC determined that PGE had been required to recover its capital investment over time, and that the rates therefore should have included interest to account for the time value of money. Third, the PUC determined that, despite the legal error, the rates that it had authorized for the 1995 to 2000 time period were just and reasonable, but that to make the post-2000 rates just and reasonable, it was required to order a refund to the post-2000 ratepayers. In affirming the PUC order, the Court of Appeals concluded that the PUC had not erred in making those three determinations. We affirm the decision of the Court of Appeals and the order of the PUC.

This case dates back to 1976, when PGE began commercial operation of the Trojan nuclear generating facility. Initially, PGE was allowed to recover its investment in that facility through rates charged over a 35-year period. Problems with the facility and other considerations led PGE to retire Trojan in 1993, before the end of that 35-year period. Since that time, PGE, the Utility Reform Project (URP), and plaintiffs (the Class Action Plaintiffs, or CAPs) in two class action cases against PGE have argued before the PUC, the Court of Appeals, and this court about PGE's recovery of the remaining balance of its capital investment in Trojan and about whether and to what extent ratepayers can recover their payments of certain amounts associated with the retired Trojan facility.[1]

---

[1] As discussed below, the CAPs are class action plaintiffs representing PGE ratepayers from the period of April 1995 through September 2000 in two class action cases against PGE.

The order at issue here, PUC Order No. 08-487, followed the Court of Appeals' remand of three prior PUC orders involving PGE's ability to recover the remaining balance of its investment in Trojan through rates. The Court of Appeals in this case affirmed the PUC's order, rejecting arguments by URP and the CAPs that the PUC had exceeded its authority on remand. *Gearhart v. PUC*, 255 Or App 58, 104-05, 299 P3d 533 (2013). Judge Schuman dissented, arguing that the methodology used by the PUC went beyond the scope of the remands and that the case should have been remanded to the PUC for further proceedings. *Id*. at 105, 113 (Schuman, J., dissenting). For the reasons discussed below, we affirm the Court of Appeals.

## I.   PUBLIC UTILITY RATEMAKING

We begin with a brief overview of public utility ratemaking. Public utilities exhibit characteristics of natural monopolies. For that reason, public utilities often are granted exclusive territories within which to operate, and many aspects of public utility operation are closely regulated by public utility commissions. *See* Charles F. Phillips, Jr., *The Regulation of Public Utilities* 4 (2d ed 1988) (explaining that public utilities are unique because they operate more efficiently as monopolies, they must be regulated to ensure they contribute to the general welfare, there is a high degree of public interest in the services rendered, and administrative commissions have jurisdiction over rates and services). In Oregon, the PUC's responsibilities include "establishing fair and reasonable rates" for services provided by public utilities. ORS 756.040(1).[2]

---

[2]  ORS 756.040(1) provides:

"In addition to the powers and duties now or hereafter transferred to or vested in the Public Utility Commission, the commission shall represent the customers of any public utility or telecommunications utility and the public generally in all controversies respecting rates, valuations, service and all matters of which the commission has jurisdiction. In respect thereof the commission shall make use of the jurisdiction and powers of the office to protect such customers, and the public generally, from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates. The commission shall balance the interests of the utility investor and the consumer in establishing fair and reasonable rates. Rates are fair and reasonable for the purposes of this subsection if the rates provide adequate revenue both for operating expenses of the public utility or

The statutes direct the PUC to examine three key components in ratemaking. First, the PUC determines the utility's operating expenses, such as wages, fuel, maintenance, and taxes. *See id.* (fair and reasonable rates allow recovery of revenue "for operating expenses"); *see also* Phillips, *The Regulation of Public Utilities* at 169. Second, the statute provides that rates should provide adequate revenue "for capital costs of the utility." ORS 756.040(1). That amount is represented in the PUC's calculation of rate base. Although the term "rate base" is not defined by statute, it is understood within public utility ratemaking to represent "the net or depreciated value of the tangible and intangible property, or net investment in the property," although there are limitations on what may be included in rate base. Phillips, *The Regulation of Public Utilities* at 169-70. Third, the PUC must determine the appropriate rate of return on the utility's capital investment. *See* ORS 756.040(1) (fair and reasonable rates allow recovery of "capital costs of the utility, with a return to the equity holder * * * [c]ommensurate with the return on investments in other enterprises having corresponding risks" and "[s]ufficient to ensure confidence in the financial integrity of the utility"); *see also* Phillips, *The Regulation of Public Utilities* at 170. The rate of return should "be fair to investors so as to avoid the confiscation of their property" and "preserve the credit standing of the utility to enable it to attract new capital to maintain, improve, and expand its services." Phillips, *The Regulation of Public Utilities* at 170.

Taken together, those components are represented in the following formula: $R = E + (V-d)r$, where "R" represents the revenue requirement, "E" represents allowable operating expenses, "V" represents rate base, "d" represents accumulated depreciation, and "r" represents the rate of return. In calculating those components, and in calculating "adequate revenue," there is no single correct sum, but rather a range of reasonable rates. *See* Phillips, *The Regulation of*

telecommunications utility and for capital costs of the utility, with a return to the equity holder that is:

"(a) Commensurate with the return on investments in other enterprises having corresponding risks; and

"(b) Sufficient to ensure confidence in the financial integrity of the utility, allowing the utility to maintain its credit and attract capital."

*Public Utilities* at 173 ("[T]he required earnings of a utility cannot be represented by a specific sum, nor determined by a precise formula."); PUC Order No. 08-487 at 7 (noting that the Commission uses this "standard ratemaking formula" to determine how much revenue a utility should receive).

When the PUC makes those calculations and sets rates, it is performing a quasi-legislative function. *Dreyer v. PGE*, 341 Or 262, 282, 142 P3d 1010 (2006). Rate orders are prospective, *Valley & Siletz R. R. Co. v. Flagg*, 195 Or 683, 715, 247 P2d 639 (1952), but, "[i]n determining the amount of each of the terms in the ratemaking formula and in making its estimate of revenues under the proposed rates, the [PUC] looks at data for a given 'test year' either in the past, present, or future." Stefan Krieger, *The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings*, 1991 U Ill L Rev 983, 995 (1991); *see* PUC Order No. 08-487 at 12 (listing test year estimates of power costs for 1995 and 1996 as one factor affecting estimated revenue requirement). The use of a test year results in rates that inherently are based on estimates that may overcompensate or undercompensate utilities. *See Krieger*, 1991 U Ill L Rev at 995, 995 n 52; *see also* Phillips, *The Regulation of Public Utilities* at 188 ("[T]he actual rate of return earned by a utility may be quite different from the rate allowed by the commission."); PUC Order No. 08-487 at 7 ("The utility absorbs the expenses if they are higher than expected and benefits if the expenses are lower, which gives the utility the incentive to manage its operations efficiently ***."). In sum, ratemaking is a unique enterprise that is governed by statute but largely left to the PUC's discretion. *See Springfield Education Assn. v. School Dist.*, 290 Or 217, 230, 621 P2d 547 (1980) (explaining that the PUC is empowered to "make delegated policy choices of a legislative nature within the broadly stated legislative policy").

## II.   FACTUAL BACKGROUND AND PROCEEDINGS BELOW

There are three separate, but related, proceedings that are relevant on review. We describe those three proceedings in detail to provide the background necessary for

understanding the order at issue in this case, PUC Order
No. 08-487.

A.  *Rate Case After Trojan's Closure: PUC Order No. 95-322
    in UE 88 and* Trojan I

   PGE began commercial operation of the Trojan
nuclear facility in 1976. At that time, the PUC allowed PGE
to recover its investment in Trojan by including that amount
in rates over a 35-year period. PGE also had the opportunity
to earn a return on its investment in Trojan because PGE's
investment in the facility was included in rate base.

   PGE retired the facility in 1993, before the end of
the 35-year period for recovering its investment, because,
as the PUC explained in PUC Order No. 08-487, "PGE con-
cluded that closing the plant was the least-cost option for its
customers, meaning that closing Trojan and replacing its
output with purchased power was expected to be less expen-
sive than continuing to operate the plant."

   After retiring the Trojan facility, PGE sought a
declaratory ruling on whether PGE could recover in rates
the remaining balance of its capital investment in the
Trojan facility. In PUC Order No. 93-1117, the PUC declared
that "*if* PGE met certain conditions and could show certain
'assumed facts' to be true in a rate case or similar forum,
then PGE could set rates to obtain both a 'return of' and
a 'return on' its Trojan investment." *Dreyer*, 341 Or at 267
(emphasis in original; footnote omitted) (summarizing PUC
Order No. 93-1117). URP and the Citizens' Utility Board
(CUB) challenged that order in circuit court, and the court
summarily affirmed. *Id.* URP and CUB appealed.

   Meanwhile, the PUC conducted a rate case consis-
tent with PUC Order No. 93-1117, which resulted in PUC
Order No. 95-322. PUC Order No. 95-322 set PGE's rates
to include both a return of and a return on PGE's invest-
ment in the Trojan facility.[3] *See Utility Reform Project v.
PUC*, 215 Or App 360, 365, 170 P3d 1074 (2007) (*Trojan II*)
(so noting). URP and CUB had intervened in the
rate case, and they challenged the order in circuit court.

---

[3] Those rates were in effect from 1995 to 2000.

*Id*.[4] The court concluded that PGE could not recover a return on its investment in Trojan and reversed. *Id*. PGE and the PUC appealed.

The Court of Appeals consolidated the two appeals and analyzed the two statutes at issue—ORS 757.140(2), which addressed the inclusion of undepreciated investments in rates, and ORS 757.355, which addressed the exclusion of certain costs from rates.[5] The court held that, "read together, ORS 757.140(2) and ORS 757.355 allow only the principal amount of the undepreciated investment to be recovered through rates." *Citizens' Utility Board v. PUC*, 154 Or App 702, 714, 962 P2d 744 (1998) (*Trojan I*). In other words, the court held, "ORS 757.140(2) authorizes rates that would reimburse the utility for its principal investment in retired capital assets"—a return *of* PGE's investment—"but it does not authorize the return on the investment that ORS 757.355 proscribes." *Id.* at 716. The court "reversed and remanded with instructions to remand [the] orders to PUC for reconsideration." *Id.* at 717. As explained below, the PUC addressed that remand in PUC Order No. 08-487, now at issue before this court.[6]

B.   *Rates Implementing Settlement: PUC Order No. 00-601 in UM 989, PUC Order No. 02-227, and* Trojan II

Following the Court of Appeals' decision in *Trojan I*, CUB and PGE agreed to a settlement that removed the

---

[4] As discussed below, the procedure for challenging PUC orders was changed in 2005, and judicial review proceedings are now filed in the Court of Appeals.

[5] ORS 757.140(2) now (as then) provides, in part, that "the commission may allow in rates, directly or indirectly, amounts on the utility's books of account which the commission finds represent undepreciated investment in a utility plant, including that which has been retired from service * * * [w]hen the commission finds that the retirement is in the public interest." At the time, ORS 757.355 (1993) provided that "[n]o public utility shall, directly or indirectly, by any device, charge, demand, collect or receive from any customer rates which are derived from a rate base which includes within it any construction, building, installation or real or personal property not presently used for providing utility service to the customer." The legislature amended ORS 757.355 in 2003, but no party argues that those amendments are material to this case. *See* Or Laws 2003, ch 202, § 2. All references to ORS 757.355 are to the 1993 version of the statute.

[6] The PUC and PGE sought review of the court's decision in *Trojan I*. This court granted review, but held the case in abeyance based on settlement talks between PGE and CUB, as well as pending legislation that could have affected the case. *See Dreyer*, 341 Or at 269. After PGE and CUB reached a settlement, which the PUC approved, this court dismissed the petition for review on its own motion. *Id.* at 269-70.

remaining balance of PGE's investment in the Trojan facility from PGE's balance sheet entirely by offsetting that amount against existing credits owed to PGE's ratepayers. *Trojan II*, 215 Or App at 366. The theory behind the settlement was that the parties could end the controversy over Trojan by removing the remaining balance from PGE's books. *Dreyer*, 341 Or at 269. As a result, following the settlement, rates would no longer include a return of or a return on PGE's investment in Trojan. The PUC approved revised rate schedules implementing the settlement in PUC Order No. 00-601, and the rates went into effect in October 2000. *Id.*

URP, however, was not a party to the settlement, and it filed a complaint with the PUC challenging the rates that the PUC imposed to implement the settlement. *Trojan II*, 215 Or App at 366. Among other things, URP argued that the rates did not provide a mechanism for recovery of amounts collected under the 1995 to 2000 rates that were attributable to a return on PGE's investment in Trojan. The PUC rejected all of URP's arguments in PUC Order No. 02-227, reasoning, in part, that it had no authority to order refunds. *Id.* at 367. URP sought review of PUC Order No. 02-227 in circuit court, and the court determined that PGE should have been required to issue refunds for the "'unlawfully collected rates as a matter of law.'" *Id.* at 368 (quoting circuit court). The court reversed and remanded, directing the PUC "'to immediately revise and reduce the existing rate structure'" or "'to order PGE to immediately issue refunds'" to allow ratepayers to recover any amounts attributable to a return on PGE's investment in Trojan. *Id.* at 368 (quoting circuit court). The PUC and PGE appealed.

The Court of Appeals vacated and remanded. *Id.* at 376. The Court of Appeals reasoned that the PUC had relied on an incorrect interpretation of ORS 757.225 in concluding that it had no authority to issue refunds.[7] Accordingly, the

_____

[7] ORS 757.225 provides:

"No public utility shall charge, demand, collect or receive a greater or less compensation for any service performed by it within the state, or for any service in connection therewith, than is specified in printed rate schedules as may at the time be in force, or demand, collect or receive any rate not specified in such schedule. The rates named therein are the lawful rates until they are changed as provided in ORS 757.210 to 757.220."

court concluded that the order had to be remanded to the PUC for reconsideration in light of the correct interpretation of that statute. *Id.* at 373. Moreover, the court noted, the circuit court's remand instructions were erroneous because the court improperly had assumed that the PUC had authority to offer a remedy and was required to exercise that authority. *Id.* at 374. The Court of Appeals explained that those issues had to be resolved by the PUC in the first instance, and the court vacated the judgment and "remanded to circuit court with instructions to remand Order No. 02-227 to PUC for reconsideration of issues raised on appeal and cross-appeal." *Id.* at 375-76. That remand also was addressed in PUC Order No. 08-487, now at issue before this court.

C.   *The CAPs' Claims Against PGE: Mandamus Proceeding in* Dreyer

After *Trojan I*, the CAPs filed an action against PGE in circuit court alleging, among other things, that PGE was liable for damages under ORS 756.185. *See* ORS 756.185(1) (providing that public utility is liable to person injured for damages sustained when public utility "does, or causes or permits to be done, any matter, act or thing prohibited by ORS chapter 756, 757 or 758 or omits to do any act, matter or thing required to be done by such statutes"). The CAPs alleged that they were entitled to damages for rates paid between 1995 and 2000 because PGE had violated ORS 757.355 by charging rates that included a return *on* PGE's investment in Trojan.

After the circuit court denied PGE's motion to dismiss, PGE sought a writ of mandamus from this court directing the circuit court to dismiss the case. *Dreyer*, 341 Or at 275-76. In *Dreyer*, we held that we could not issue a peremptory writ ordering the circuit court to dismiss the case because we concluded that the CAPs' claim under ORS 756.185 had a basis in law. *Id.* at 279-80, 283. In particular, we rejected PGE's argument that ORS 757.225, which prohibits public utilities from collecting rates greater or lesser than those approved by the PUC, made the rates approved by the PUC and charged by PGE between 1995 and 2000 necessarily lawful. *See id.* at 279-80 (explaining that ORS 757.225 "is not aimed, as PGE suggests, at conclusively and

permanently binding the entire world to the rate decisions of the PUC"). In other words, we rejected PGE's argument that ORS 757.225 embodies a strict version of the "filed rate doctrine" that would treat all PUC-approved rates as conclusively lawful until changed, and to bar any claim by the CAPs for damages based on the PUC-approved rates that PGE had charged between 1995 and 2000. *See id.* at 278-80.[8] *Dreyer* also rejected PGE's argument that the circuit court lacked jurisdiction to hear the case because it inherently would involve ratemaking. *See id.* at 282 (concluding that one approach for addressing damages might "invade the PUC's exclusive ratemaking authority," but that alternative approach might not do so).

Nonetheless, we concluded that the circuit court had "a legal duty to abate the proceedings" because the PUC remand proceedings for PUC Order No. 95-322 involved "(essentially) the same controversy." *Id.* at 283. We reasoned that the PUC had primary jurisdiction "to determine what, if any, remedy it [could] offer to PGE ratepayers." *Id.* at 286. We went on to explain that, if the PUC could provide a remedy, the CAPs' claims might become moot. *Id.* We issued a peremptory writ ordering the circuit court to abate the CAPs' case.

D.   *Order at Issue on Review: PUC Order No. 08-487*

Following the three appellate cases discussed above, the PUC conducted further proceedings and issued a 106-page order addressing the *Trojan I* and *Trojan II* remands. That order began by resolving three threshold issues. First, the PUC explained that *Trojan I* had not declared the 1995 to 2000 *rates* unlawful, but rather had held that the rate *order* was based on an error of law. The PUC concluded that even if the rate order was erroneous, the overall rates themselves could be lawful.

Second, the PUC determined that it had authority to order a utility to issue refunds in limited circumstances, including when necessary to "remedy an error identified by

---

[8] The filed rate doctrine provides that "any rate filed with and approved by the relevant ratemaking agency represents a contract between the utility and the customer and is conclusively lawful until a new rate is approved." *Dreyer*, 341 Or at 270 n 10.

a reviewing court on appeal." The PUC appeared to conclude that that authority stemmed from ORS 756.040, which gives the PUC authority to do "all things necessary and convenient" in the exercise of its legislatively delegated powers.

Third, the PUC clarified its understanding of this court's decision in *Dreyer*, particularly noting that this court had not determined the scope of the filed rate doctrine or its impact on the PUC's remedial authority. On the contrary, noted the PUC, this court had left it to the PUC to determine in the first instance whether and to what extent the PUC had remedial authority.

In applying those legal principles, the PUC concluded that its task was to determine whether the 1995 to 2000 rates and the post-2000 settlement rates were just and reasonable. The PUC began by examining what rates it would have approved for the period from 1995 to 2000 if it had known that it could not authorize PGE to recover a return on its investment in Trojan. The PUC concluded that it had to "undertake a comprehensive review of the ratemaking decisions" at issue in *Trojan I* as a "natural consequence of [the PUC's] statutory and constitutional mandates." Although the PUC acknowledged that in doing so it would not be setting rates, it concluded that ratemaking principles should guide its analysis. In adopting that framework, the PUC rejected URP's argument that the PUC could simply remove the return on investment in Trojan from rates "while holding all other rate determinations constant."[9] Instead, the PUC's review involved reexamining elements of the revenue requirement that were affected by the decision in *Trojan I*, and then comparing the new revenue requirement with that approved in 1995. In undertaking that review, the PUC reopened the record to allow the PUC to consider new evidence in light of *Trojan I*.

The PUC analyzed aspects of its ratemaking decision in PUC Order No. 95-322 that it believed would have been affected by *Trojan I*. Before this court, URP and the

---

[9] According to URP, using its proposed method, PGE would owe the 1995 to 2000 ratepayers $522.8 million, which includes interest. URP further contends that PGE owes the post-2000 ratepayers $436.4 million. As discussed below, using the PUC's method, the only refund ordered was $33.1 million to the post-2000 ratepayers.

CAPs challenge the PUC's decision to use a different amortization period for return of PGE's investment in Trojan than it had used when it set rates previously and its related decision to reexamine rates as if PGE had been allowed to recover interest on the undepreciated balance during that shorter amortization period.

In undertaking its reexamination, the PUC shortened the amortization period from 17 years to 10 years because, without the opportunity to earn a return on its investment in Trojan, recovery of PGE's investment over 17 years "would likely increase PGE's risk profile."[10] Because of that "opportunity cost," the PUC concluded that, had it not provided for a return on PGE's investment, it would have used the shorter period of 10 years to "equitably allocate the benefits and burdens while allowing quicker recovery to offset any increase in PGE's risk profile."

Moreover, the PUC concluded, if it had not allowed PGE to earn a return on its investment, it would have allowed it to recover "some form of interest—not profit—to compensate the utility for the delayed recovery of the investment." Although the PUC noted that it often uses a utility's authorized rate of return as the applicable interest rate, it concluded in its reexamination that it would have used a different interest rate because of *Trojan I*. The PUC used the 1994 United States Treasury 10-year bond rate, which was 7.09 percent, reasoning that that rate would reflect only the time value of money, and not any risk premiums, profit, or other return on investment.[11]

Based on the shorter amortization period, the inclusion of interest, and other adjustments that the PUC made in

---

[10] The PUC originally had chosen the 17-year amortization period because it had allowed PGE to continue to include its undepreciated investment in Trojan in rate base, and there were *17 years left in the original 35-year amortization period* at that time. In setting these rates, the PUC is directed by statute to provide "a return to the equity holder that is: (a) Commensurate with the return on investments in other enterprises having corresponding risks; and (b) Sufficient to ensure confidence in the financial integrity of the utility, allowing the utility to maintain its credit and attract capital." ORS 756.040(1).

[11] In contrast, in its original rate order, PUC Order No. 95-322, "PGE's pretax rate of return was 13.22 percent for 1995 and 13.34 percent from 1996 forward. PGE's authorized rate of return was 9.51 percent in 1995 and 9.6 percent from 1996 forward." *See* PUC Order No. 08-487 at 62 n 227.

its reexamination, the PUC concluded that the 1995 to 2000 rates would have been $4.03 million higher than the authorized rates. Because ratepayers would have had to pay $4.03 million *more* in rates during the 1995 to 2000 time period if the PUC had not made the legal error identified in *Trojan I*, the PUC reasoned that "there [was] no basis to conclude that the error identified in *Trojan I* \* \* \* resulted in unjust and unreasonable rates" during that period. In other words, because the PUC's error had benefitted ratepayers by creating rates that were too low, the rates that the ratepayers actually had paid could not have been unjust and unreasonable.

The PUC went on to explain that its recalculation of the 1995 to 2000 rates also would have affected the rates it would have set following the 2000 settlement. Specifically, the PUC concluded that, had it used the shorter amortization period, the result would have been a remaining Trojan balance at the time of settlement that was $15.4 million less than the balance that it had actually used to calculate the settlement. Thus, fewer offsetting ratepayer credits would have been needed to remove the remaining Trojan balance from PGE's books. That, in turn, would have left more credits on PGE's books to benefit ratepayers following the 2000 settlement. Because the PUC concluded that it had remedial authority, the PUC determined that it could compensate the post-2000 ratepayers for the difference between the rates approved following settlement and the rates that would have been approved if the remaining balance had been $15.4 million lower. The PUC ordered PGE to issue a refund to the post-2000 ratepayers to compensate for the amount of that difference plus interest at PGE's authorized rate of return from 2000—9.6 percent—for a total refund amount of $33.1 million. With the $33.1 million refund as an adjustment to the settlement that had originally produced the post-2000 rates, the PUC concluded that "the settlement was reasonable and appropriate, and that the resulting rates were just and reasonable." The PUC rejected URP's remaining challenges to the settlement rates.

E.   *The Court of Appeals Decision*

The Court of Appeals affirmed. *Gearhart*, 255 Or App at 105. The court began by addressing the PUC's authority

on remand, concluding that the PUC had authority to exercise its broad discretion and reexamine rates for the period when rates had included an unlawful component. The court ruled that the PUC could undertake that inquiry to determine what rates it would have approved in the absence of error because no judicial instruction limited the PUC from doing so. *Id.* at 88. The court also affirmed the outcome of that inquiry: "We hold that the PUC's conclusion—that the inclusion of the unlawful component did not cause the rates to be unjust or unreasonable and, therefore, has not resulted in any unrectified damage to ratepayers—was consonant with the remands and with the PUC's responsibility * * *." *Id.* at 94. In support of that conclusion, the court noted that the legality of the end result of ratemaking, and not the legality of each calculation or input, controls. *Id.*

The court went on to conclude that "[t]he PUC did not err in allowing PGE interest," because it was within the PUC's discretion to reach that issue and to allow rates to account for the time value of money. *Id.* at 95. Moreover, the court stated, the PUC's decision to allow interest was not equivalent to allowing PGE to recover a prohibited return *on* its investment, but rather was part of allowing PGE to recover a return *of* its investment. *Id.* at 95-96.

The court next concluded that the PUC had the authority to order PGE to issue refunds, and the court again noted the breadth of the PUC's statutory authority. *Id.* at 98, 103. The court also noted that the PUC had not engaged in retroactive ratemaking when it ordered those refunds.[12] *Id.* at 100. The court detailed prior Oregon cases that had addressed the rule against retroactive ratemaking and reasoned that it "is or should be * * * narrow" in Oregon, prohibiting the PUC from incorporating past profits or losses in future rates but allowing certain other retroactive adjustments. *Id.* at 100. Along those lines, the court held that the rule "does not prohibit the PUC from determining that a refund is appropriate when there is a determination on

---

[12] As discussed below, the rule against retroactive ratemaking has been differently defined and applied by various courts, but one commentator describes the rule as "prohibit[ing] a public utility commission from setting future rates to allow a utility to recoup past losses or to refund to consumers excess utility profits." Krieger, 1991 U Ill L Rev at 984.

judicial review that a timely appealed rate order is erroneous." *Id*. The Court of Appeals concluded by rejecting URP's arguments that certain aspects of the PUC's order were not supported by substantial evidence and were outside the PUC's discretion. *Id*. at 103-04.

Judge Schuman dissented. Although he agreed with most of the majority's discussion, he argued that prior appellate decisions limited the PUC's authority on remand so that the PUC had to "simply determin[e] the effect on the previously approved rates of including Trojan in the rate base." *Id*. at 105, 107 (Schuman, J., dissenting). Moreover, Judge Schuman reasoned that the PUC had violated the law by including Trojan in the rate base. As a result, the rates were "unlawful no matter how fair and reasonable they may be, and the PUC's role on remand [was] to determine a remedy for that unlawfulness." *Id*. at 108, 112-13. The dissent would have "reverse[d] [the PUC's] order on the pre-October 2000 rates and remand[ed] the case for further proceedings." *Id*. at 113.

The Court of Appeals denied a request for reconsideration, and URP and the CAPs petitioned for review. On review, the parties ask this court to address five issues: (1) whether the PUC exceeded its authority on remand with respect to the April 1995 to September 2000 rates and with respect to the rates implemented in October 2000 after the settlement; (2) whether the PUC had authority to order PGE to issue refunds to its customers; (3) whether the PUC erred in allowing PGE to recover interest; (4) whether the PUC order was supported by substantial evidence; and (5) whether the CAPs can proceed with their action against PGE in circuit court.[13]

## III.  THE PUC'S AUTHORITY ON REMAND

The powers and duties of the PUC, like those of other executive agencies, are limited to those expressly

---

[13] Since 2005, PUC final orders have been subject to judicial review as orders in contested cases under the Oregon Administrative Procedures Act (APA). ORS 756.610(1); *see also* ORS 183.315(6) (noting sections of the APA that do not apply to the PUC). Under the APA, "[r]eview of a contested case shall be confined to the record, and the court shall not substitute its judgment for that of the agency as to any issue of fact or agency discretion." ORS 183.482(7).

authorized or necessarily implied by statute. *See Ochoco Const. v. DLCD*, 295 Or 422, 426, 667 P2d 499 (1983) ("[Agency] power includes that expressly conferred by statute as well as such implied power as is necessary to carry out the power expressly granted."). The PUC has express authority to "establish[ ] fair and reasonable rates" for utility services, and, in doing so, the PUC must "balance the interests of the utility investor and the consumer." ORS 756.040(1). As part of that balance, the legislature directed the PUC to, on the one hand, "protect [public utility] customers, and the public generally, from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates," and, on the other hand, to establish rates that "provide adequate revenue" for both the operating expenses and the capital costs of the utility, "with a return to the equity holder." *Id.*

In this case, the PUC exercised its ratemaking authority when it originally issued PUC Order No. 95-322, allowing PGE to recover both a return of and a return on its investment in Trojan, and again when it issued the order implementing the rates agreed to in the settlement between PGE and CUB. We examine the PUC's actions on remand in light of its ratemaking authority and the authority arising from the binding remand order from the Court of Appeals.[14] In particular, we examine the PUC's actions of reexamining the rates that it previously had authorized; ordering PGE to refund a portion of rates that had been collected as a result of the PUC's legal error of allowing PGE to recover a return on its investment in Trojan; and concluding that it would have allowed PGE to recover interest on the undepreciated balance of its investment in Trojan to account for the time value of money. We begin by examining the scope of the remand, and then turn to the statutory scheme to determine whether the PUC had authority to take those actions.

---

[14] As noted, *Trojan II*—and the subsequent remand—did not arise directly out of the PUC's order setting rates following the PGE and CUB settlement, PUC Order No. 00-601. Rather, after the PUC issued that order, URP filed a complaint before the PUC challenging those rates, and it was the order rejecting that challenge that was at issue in *Trojan II*, PUC Order No. 02-227. *See Trojan II*, 215 Or App at 366-67.

## A. *The Scope of the Remand*

PUC rate orders are subject to judicial review. *See* ORS 756.610(1) ("[F]inal orders of the Public Utility Commission are subject to judicial review as orders in contested cases under the provisions of ORS 183.480 to 183.497 [of the APA].."). Although a 2005 law made PUC final orders subject to review under the APA, the PUC orders at issue in both *Trojan I* and *Trojan II* were subject to review under the PUC's own judicial review statutes. *See* Or Laws 2005, ch 638, § 6 (amending PUC judicial review statute to bring review of PUC orders under the APA). Under those statutes, a party aggrieved by a PUC order could bring a suit against the PUC in circuit court. *See former* ORS 756.580 (2003), *repealed by* Or Laws 2005, ch 638, § 21 (allowing a party "aggrieved by any findings of fact, conclusions of law or order" to "prosecute a suit against the commission" in circuit court). The circuit court could "affirm, modify, reverse or remand the order," but could not "substitute its judgment for that of the Public Utility Commission as to any finding of fact supported by substantial evidence." *Former* ORS 756.598(1) (2003), *repealed by* Or Laws 2005, ch 638, § 21. A party challenging an order had to show "that the order [was] unreasonable or unlawful." *Former* ORS 756.594 (2003), *repealed by* Or Laws 2005, ch 638, § 21 ("[T]he burden of proof is upon the party seeking to modify, vacate or set aside findings of fact, conclusions of law or the order to show by clear and satisfactory evidence that the order is unreasonable or unlawful.").

Unlike the APA, the PUC judicial review statutes did not direct the court to take any particular action when concluding that the PUC had erred. *Compare Mitchell Bros. Trk. Lines v. Hill*, 227 Or 474, 480, 363 P2d 49 (1961) (concluding that the purpose of the PUC judicial review statute was "to grant to the courts a full scope of review to administer the relief appropriate to the cause"), *with Megdal v. Board of Dental Examiners*, 288 Or 293, 319-20, 605 P2d 273 (1980) (explaining that, under the APA, "[i]f error is found, the statute provides for reversal, modification, or remand as appropriate to the character of the error and the agency's further role in the matter"). Under general principles of

administrative law, however, remand usually is the appropriate remedy when the court concludes that an agency has erred. Charles H. Koch, Jr., 3 *Administrative Law and Practice* § 8:62[1], 295 (3d ed 2010) ("The most appropriate remedy is usually remand to the agency for it to correct any error."); *see also* Krieger, 1991 U Ill L Rev at 1022 (noting that, in most jurisdictions, if a rate order is reversed by a reviewing court, "the court remands the case to the commission either for further proceedings or the entry of a new order"). In particular, a general remand, without specific instructions to the agency, allows the court to perform its review function without invading the province of the agency. *See* Koch, 3 *Administrative Law and Practice* § 8:62 at 295 ("Rarely should a court impose its will on the agency by specific instructions. Usually the best approach is for the court to note the error and allow the agency to correct that error.").

Even when an agency has interpreted a statute incorrectly—that is, when the agency has made a legal error—courts ordinarily remand for the agency to apply the law as interpreted by the court. *See, e.g.*, *Jefferson County School Dist. No. 509-J v. FDAB*, 311 Or 389, 395-96, 399, 812 P2d 1384 (1991) (concluding that agency erroneously interpreted the term "duty" and affirming Court of Appeals decision to remand to agency under the APA "to apply the proper interpretation of 'duty'"); *but see* Dearborn v. Real Estate Agency, 334 Or 493, 504-06, 53 P3d 436 (2002) (reversing, without remanding, agency order revoking real estate license where order acknowledged that there was no evidence to support the ruling under the interpretation of the law adopted by the court). It is particularly appropriate for a court to remand when application of the correct interpretation of law requires a discretionary decision that has been delegated to the agency. *See Dickinson v. Davis*, 277 Or 665, 675-76, 561 P2d 1019 (1977) (explaining that, under PUC judicial review statutes, modification of an agency order on review "is proper only when the court can find that the law mandates one single correct result," and remanding case back to trial court that improperly had substituted its judgment on discretionary issue decided by agency); *Springfield Education Assn.*, 290 Or at 240 (modifying agency order where it could "simply be corrected by

modification in [a] single respect" and where "no further determinations need[ed to] be made by [the agency]").

As noted, ratemaking involves discretionary decisions that the legislature largely has entrusted to the PUC. *See* ORS 756.040(1) (providing that the PUC is charged with "establishing fair and reasonable rates"); *Springfield Education Assn.*, 290 Or at 229-30 (noting that legislature delegated discretionary decisions involved in ratemaking to PUC). Accordingly, courts reviewing a rate order "do not attempt as an original question to exert authority over rates." *Valley & Siletz R. R. Co.*, 195 Or at 715 (internal quotation marks omitted). In other words, courts review a rate order to determine whether it complies with statutory and constitutional requirements; on determining that a rate order violates a statute or the constitution, courts typically remand, rather than modify, a rate order because such a modification often would involve ratemaking. *See* Krieger, 1991 U Ill L Rev at 997 ("Because courts consider the fixing of specific rates a function solely for the commission, judges will not order new rates if they reverse the commission-ordered rates on review. Instead, they will remand the case to the commission for the setting of new rates consistent with the decision on review.").

In accordance with those limitations, in both *Trojan I* and *Trojan II*, the Court of Appeals directed that the orders be remanded to the PUC, and the court did not direct the PUC to take any particular action on remand. In *Trojan I*, after the court concluded that the PUC had erred by interpreting the statutes to allow PGE the opportunity to recover a return on its investment in Trojan, the court "reversed and remanded with instructions to [the circuit court to] remand orders to PUC for reconsideration." 154 Or App at 717. In *Trojan II*, the court "remanded to circuit court with instructions to remand Order No. 02-227 to PUC for reconsideration of issues raised on appeal and cross-appeal." 215 Or App at 376. The court did not, for example, remand with instructions for the PUC to calculate the amount of rates attributable to a return on investment in Trojan or with instructions to refund that amount. Nor did the court modify the PUC's order to remove that amount from rates.

The remand instructions from the Court of Appeals did not
purport to limit the authority of the PUC on remand, con-
sistently with the general understanding that a reviewing
court should direct agency action on remand only when
"the law mandates one single correct result." *See Dickinson*,
277 Or at 675. Here, *Trojan I* held that the PUC could not
include a return on PGE's Trojan investment in rates. It
did not hold, however, that that interpretation of law man-
dated a single *result*. Consequently, the court remanded the
case to the PUC to determine the result, or effect, of that
interpretation.

    Moreover, although the parties argue about whether
*Trojan I* declared the rate *order* or the *rates* themselves
unlawful, that distinction does not control our analysis.
Rather, we focus on the effect of the holding in *Trojan I*.
*Trojan I* held that the statutes "preclude[d]" the PUC "from
allowing rates *** that include[d] a rate of return" on
retired capital assets, as the orders at issue in that case had
allowed. *Trojan I*, 154 Or App at 716. Stated differently, the
court concluded that the PUC did not have statutory author-
ity to include a return on PGE's Trojan investment in rates.
The court did not address the effect of that error on PGE or
its ratepayers. At no point did the court conclude that either
PGE or its ratepayers had been injured by that error. Thus,
contrary to URP's arguments, *Trojan I* required only that
the PUC not include a return on investment in Trojan in
PGE's rates. It had no more specific effect in limiting the
PUC's authority on remand.[15]

    We turn next to the statutory scheme to determine
whether the PUC had authority to determine the effect of

---

[15] The PUC concluded in PUC Order No. 08-487 that removal of a return
on investment would have led to higher rates and that the PUC's legal error
therefore did not "result in unjust and unreasonable rates during the April 1995
through September 2000 period." The PUC went on to state that those rates
"were just and reasonable." We focus on the total effect of the rate order, rather
than the rates themselves, in affirming the PUC. We do not address whether
rates that include a component prohibited by the law can be just and reasonable,
an issue discussed by both the majority and dissenting opinions in the Court of
Appeals. Instead, consistent with our decision in *Dreyer*, we determine only that
the fact that rates include a component that is prohibited by statute does not
necessarily mean that ratepayers have been injured. *See Dreyer*, 341 Or at 285
(noting that PUC proceeding could determine "whether [ratepayers] have been
injured (and, if they have been, the extent of the injury)").

the PUC's error on ratepayers by reexamining prior rates, and, if so, whether the PUC had authority to order PGE to issue refunds.

B.  *Reexamination of Previously Authorized Rates to Determine Injury*

Rate orders are inherently prospective, setting rates to be collected from future ratepayers. *See Valley & Siletz R. R. Co.*, 195 Or at 715 (noting that "all rate orders are prospective in character"). Accordingly, URP and the CAPs reason, the PUC cannot reexamine past rate orders, reversed on judicial review, to determine whether the rates set were just and reasonable. Moreover, they note, courts around the country have held that state utility commissions cannot reexamine past rates on remand. URP and the CAPs urge this court to adopt a similar approach by adopting a rule against retroactive ratemaking.

Although the rule against retroactive ratemaking has been defined and applied in many different ways, the rule can be described generally as "prohibit[ing] a public utility commission from setting future rates to allow a utility to recoup past losses or to refund to consumers excess utility profits." Krieger, 1991 U Ill L Rev at 984; *see also Dreyer*, 341 Or at 270 n 10 (explaining that, under the rule, "approved utility rates may be modified only prospectively" and "utilities cannot provide retrospective relief from such rates"). We have never expressly decided whether Oregon accepts some form of the rule against retroactive ratemaking. *See id.* (so noting). For purposes of this case, we need not precisely define the contours of that rule or decide whether Oregon accepts that rule in all circumstances. It is sufficient for present purposes to conclude, as we do, that the rule against retroactive ratemaking does not preclude the action that the PUC took on remand in this case. The PUC did not alter PGE's rates retroactively, but rather used ratemaking principles to calculate the rates that it would have authorized PGE to charge had it not included a return on the investment in Trojan.

First, nothing in Oregon's statutory scheme, which delegates extensive power to the PUC, limits the PUC's

authority in a way that would have prevented it from reexamining past rates in this case. *See Hammond Lbr. Co. v. Public Service Com.*, 96 Or 595, 609, 189 P 639 (1920) (explaining that predecessor to the PUC was charged "with statutory duties closely allied to the legislative power of the state"). Courts applying the rule against retroactive ratemaking to prevent utility commissions from retroactively examining or altering rates often rely on statutes that differ in their terms from the Oregon statutes. In *Arkansas Louisiana Gas Co. v. Hall*, 453 US 571, 578, 101 S Ct 2925, 69 L Ed 2d 856 (1981), for example, the United States Supreme Court stated that the Federal Energy Regulatory Commission (FERC) had "no power to alter a rate retroactively" because the governing statute provided that, when FERC found a rate unreasonable, it had to determine the just and reasonable rate to be "thereafter" observed. *See also* Krieger, 1991 U Ill L Rev at 1033 (explaining that some courts have relied on the word "thereafter" to conclude that utility commissions have power to set rates only prospectively). In contrast, in Oregon, any time a public utility files a new rate or schedule or an increase in an existing rate or schedule, the PUC may "conduct a hearing to determine whether the rate or schedule is fair, just and reasonable." ORS 757.210(1)(a). After the PUC conducts a "full hearing, whether completed before or after such rate or schedule has gone into effect, the commission may make such order in reference thereto as would be proper in a proceeding initiated after such rate or schedule has become effective." ORS 757.215(3); *see also* ORS 756.558(2) (providing that PUC shall "make and enter the order" of the PUC on a complaint based on findings of fact and conclusions of law, and that order shall state effective date). The complaint and hearing provisions of the PUC statutes say nothing about setting rates only prospectively, or rates to be "thereafter" observed. Therefore, the statutes did not preclude the PUC from reexamining the previously charged rates as ordered by the Court of Appeals.

Second, in *Dreyer*, this court rejected the notion that Oregon's statutory scheme incorporates an "extreme" version of the filed rate doctrine, which serves as another common rationale for prohibiting the retroactive examination of rates. *See Dreyer*, 341 Or at 278-79. As noted, the filed

rate doctrine generally provides that "any rate filed with and approved by the relevant ratemaking agency represents a contract between the utility and the customer and is conclusively lawful until a new rate is approved." *Id.* at 270 n 10. In *Dreyer*, PGE argued that that doctrine is embodied in ORS 757.225, which provides:

> "No public utility shall charge, demand, collect or receive a greater or less compensation for any service performed by it within the state, or for any service in connection therewith, than is specified in printed rate schedules as may at the time be in force, or demand, collect or receive any rate not specified in such schedule. The rates named therein are the lawful rates until they are changed as provided in ORS 757.210 to 757.220."

The court in *Dreyer* did not find that argument persuasive. Although the court stated in a footnote that it was not rejecting "the possibility that Oregon utility law incorporates some form of the doctrine," *Dreyer*, 341 Or at 279 n 14, the court rejected the notion that PGE was shielded from liability because it was required by ORS 757.225 to charge the rates that were later held to improperly include a return on the investment in Trojan. *Id.* at 279-80.

Thus, unlike some courts, this court has not read ORS 757.225 as a manifestation of legislative intent to allow retroactive relief only when a utility collects rates different than those approved by the PUC. *See* Krieger, 1991 U Ill L Rev at 1033-34 (noting that some courts have interpreted similar provisions to "infer that the legislature intended the granting of retroactive relief only in the limited circumstances when a utility assesses a rate that is different from the approved tariff"). *Dreyer* instead suggests that a utility that collects rates approved by the PUC may have to return a portion of those rates if they are later found to be invalid on judicial review. *See Dreyer*, 341 Or at 278-79 (ORS 757.225 does not absolutely shield utilities from having to return part of rates later determined to have included an unlawful component). Moreover, as this court noted in *Dreyer*, ORS 757.225 is a direction to *utilities*—"[n]o public utility shall charge *** greater or less compensation *** than is specified in printed rate schedules"—and not a limit on the authority of the *PUC. Id.* at 278; *see* Krieger, 1991

U Ill L Rev at 1034 (suggesting that those types of provisions prevent utilities from changing their rates without PUC approval, but noting that, textually, such provisions do not address PUC authority). This court's analysis of ORS 757.225 in *Dreyer* suggests that that statute is not a limit on the PUC's authority to reexamine past rates, because commission-approved rates are not "conclusively lawful for all purposes." *See Dreyer*, 341 Or at 278.

Finally, we consider whether the rule against retroactive ratemaking, independently of the statutory provisions discussed above, precluded the action that the PUC took on remand in this case. We conclude that it did not. The theory behind the rule is that ratemaking inherently is a prospective process. Krieger, 1991 U Ill L Rev at 998. Courts have applied the rule against retroactive ratemaking in a variety of ways, with some courts rejecting the rule entirely. *See id*. at 1022, 1027 (explaining that cases are "almost evenly split" as to whether a prevailing party can obtain retroactive relief in the form of a refund or a surcharge for the period between the order and reversal and the period after reversal). Of those courts adhering to the rule, some have interpreted it as preventing a PUC from ordering *any* refunds or surcharges. *See, e.g.*, *In re Application of Columbus S. Power Co.*, 138 Ohio St 3d 448, 460-61, 8 NE 3d 863, 874-76 (2014) (explaining that excessive rates charged during the appeal of a commission order are not subject to refund and that "present rates may not make up for revenues lost due to regulatory delay"). Others have interpreted the rule as preventing a PUC from adjusting future rates based on actual expenses and revenues. *See, e.g.*, *In re Providence Water Supply Bd.'s Application to Change Rate Schedules*, 989 A2d 110, 115, 118 (RI 2010) (explaining that future rates may not be designed to recoup past losses and affirming PUC denial of request to increase rates to cover past payments for retirees' health-care costs).

In considering whether the rule against retroactive ratemaking prohibits the PUC's reexamination of previously set rates in this case, it is important to recognize the context: the issue was not back before the PUC because projected circumstances on which rates were based (such as expected

profits or losses) had not come to pass as forecast. Rather, the orders at issue in PUC Order No. 08-487 were remanded to the PUC because it made an error of law in exercising its ratemaking authority described in ORS 756.040. The PUC was not reexamining past rates because ratepayers were seeking to benefit from PGE's excess profits, or because PGE was asking ratepayers to make up for a year of particularly bad losses. The PUC was reexamining past rates because the Court of Appeals concluded that the PUC had made a legal error in setting those rates. *See Indep. Voters of Ill. v. Ill. Commerce Com'n*, 117 Ill 2d 90, 104-05, 510 NE 2d 850, 857 (1987) (rejecting argument that rule against retroactive ratemaking applies after rate order is reversed by reviewing court where commission action was "a result of a direct, statutorily authorized, review" of the commission's order); *District of Columbia v. D.C. Pub. Serv. Com'n*, 905 A2d 249, 258-59 (DC 2006) (suggesting that refund might be appropriate where agency is implementing judicial reversal of order, but rejecting argument that agency, like courts, can undo what is wrongfully done by its order where final order was not subject to judicial review or reversed on appeal).

Given the posture of the remand orders, the PUC could rely on the ratemaking authority that it had exercised in the original proceedings under ORS 756.040 to determine on remand the effect of the Court of Appeals' interpretation of law on its earlier decision. *See Jefferson County School Dist. No. 509-J*, 311 Or at 395, 399 (affirming Court of Appeals decision to remand order reversing dismissal of a school teacher to Fair Dismissal Appeals Board "to apply the proper interpretation of 'duty' and, in the light of that interpretation, to reconsider whether [the teacher] had neglected a duty she owed"); *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 US 194, 200, 67 S Ct 1575, 91 L Ed 1995 (1947) ("After the remand was made, therefore, the [Securities and Exchange] Commission was bound to deal with the problem afresh, performing the function delegated to it by Congress."). The exercise of that authority on remand included the authority to reconsider all aspects of the decision affected by the error. *See Jefferson County School Dist. No. 509-J*, 311 Or at 396-97, 399 (affirming remand for agency to apply correct interpretation of term "duty" in determining whether teacher

properly was dismissed for "neglect of duty," and, because that error "permeated [the agency's] sanction analysis," also affirming remand for reconsideration of that issue).[16] The ability to reconsider multiple aspects of the rate order was necessary because ratemaking involves a variety of inter-related variables. *See Hammond Lbr. Co.*, 96 Or at 609 (noting that "it is impossible to fix rates that will be mathematically correct or exactly applicable to all the new conditions that may arise" because "the factors involved in an inquiry of this kind are so many and so variable"); Phillips, *The Regulation of Public Utilities* at 168 (explaining that the different aspects of rate regulation "overlap in many instances"). To the extent that the PUC's error in allowing PGE to recover a return on its investment in Trojan affected other parts of the PUC's original ratemaking analysis, the PUC could consider those effects in assessing the effect of the error on the rate order.

In addition, the rationale behind the rule against retroactive ratemaking does not support its application to this circumstance. The rule against retroactive ratemaking serves the important function of providing stability in the regulatory process—parties can reasonably rely on the fact that rates will not be changed after they have been set and paid. Krieger, 1991 U Ill L Rev at 1044. Moreover, the rule plays a critical role in providing an incentive for efficient operations because utilities know that they can keep profits

---

[16] The CAPs attempt to distinguish *Jefferson County School District No. 509-J*, 311 Or 389, by noting that the agency in that case "did not redetermine past facts" or allow new issues or evidence. However, nothing in this court's opinion suggested that the agency could not have reopened the record or reconsidered prior determinations if it had concluded that that was appropriate.

Moreover, there is nothing in the PUC judicial review statutes in place during *Trojan I* that suggests that the PUC could not reopen the record on remand or otherwise reconsider its analysis of facts in the existing record. Administrative records often are reopened on remand. *See* Pierce, 3 *Administrative Law Treatise* § 18.1 at 1679 (5th ed 2010) (discussing agency options on remand, including option of reopening record to receive additional evidence). Although a remand based on legal error may not typically require the taking of additional evidence, the CAPs have not identified anything in the statutes or the remand instructions in *Trojan I* that prevented the PUC from doing so. *See id.* (explaining agency options on remand, but not discussing reopening the record when remand is based on error of law); Koch, *Administrative Law and Practice* § 8:31 at 186, 191 (suggesting that remand for application of correct legal principle may occur on the existing record, but also noting that "the agency is somewhat free to decide how to carry out the judicial will").

even if they exceed the authorized rate of return and that they cannot seek to recover losses from ratepayers. *Id.* Here, however, when URP and CUB appealed the PUC's original rate order, PUC Order No. 95-322 from 1995, all parties knew that the rate order might be reversed on review. Given that knowledge, the parties could not reasonably rely on the rates not being reexamined, and PGE continued to have an incentive to operate efficiently because it did not know whether the rate order would be reversed on review. *See id.* at 1046 (explaining that appeal of rate order should lead to expectation that court may reverse rates on review and that allowing retroactive ratemaking after judicial review does not create negative economic incentives).

In sum, when a PUC order issued in the exercise of its ratemaking authority has been reversed and remanded after a reviewing court determines that there was a legal error, the PUC can again use ratemaking principles on remand to determine the effect of its error on the outcome of the proceeding. Although the rule against retroactive rate-making may prevent certain actions on remand, it does not prevent the PUC from reexamining prior rates to determine what rates it would have set in the absence of its legal error. Because the PUC in this case reexamined past rates following judicial review and reversal of prior rate orders, we conclude that that reexamination was permissible and did not violate the rule against retroactive ratemaking.

C.  *PUC Authority to Order Refunds*

Independent of their challenge to PUC's methodology for determining the effect of its legal error, the CAPs challenge the PUC's authority to remedy that error by ordering refunds to the post-2000 ratepayers who were injured by that error.[17] More fundamentally, however, the

---

[17] URP challenges the refund primarily on the ground that the PUC erred in calculating the refund by engaging in retroactive ratemaking, and does not challenge the PUC's authority to order PGE to issue refunds. In fact, URP seems to assume that the PUC can order PGE to issue refunds, albeit by reducing future rates, rather than reexamining past rates. URP asserts that, on remand, the PUC had to "calculate the prior unlawful charges" and "return those funds, with appropriate interest, to those who paid them." Because we have already addressed URP's retroactive ratemaking arguments above, we do not discuss URP's arguments regarding refunds further in this section.

CAPs argue that they should be able to proceed in circuit court regardless of whether the PUC has the authority to issue refunds. That is so, the CAPs assert, because either the PUC lacks authority to offer a remedy to the CAPs or the PUC has declined to offer any remedy that it has the authority to provide.

We begin by considering whether the PUC had authority to provide a remedy to the post-2000 ratepayers by ordering PGE to issue refunds. As noted, the PUC's statutory authority is phrased in sweeping terms. *See* ORS 756.040(2) (granting the PUC authority to "supervise and regulate every public utility" in the state and "to do all things necessary and convenient in the exercise of such power and jurisdiction"). In exercising that authority, the PUC is charged with "mak[ing] use of the jurisdiction and powers of the office to protect [public utility] customers, and the public generally, from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates." ORS 756.040(1). In addition, the legislature has directed that laws administered by the PUC "shall be liberally construed in a manner consistent with the directives of ORS 756.040(1) to promote the public welfare, efficient facilities and substantial justice between customers and public and telecommunications utilities." ORS 756.062(2). Reading those statutes together, a liberal construction of both the PUC's power to "supervise and regulate public utilities" and its duty to protect ratepayers by obtaining adequate service at fair and reasonable rates supports the PUC's implied authority to correct legal errors that lead to "unjust and unreasonable exactions." Refunds are one way of correcting those types of errors, and if the PUC could not order refunds, it would be limited in its ability to protect ratepayers. *See Springfield Education Assn.*, 290 Or at 230 (PUC must regulate to allow just and reasonable rates and has authority to make delegated policy choices "within the broadly stated legislative policy"). *See generally Ochoco Const.*, 295 Or at 434 (concluding that agency did not have specific implied power, in part because none of the duties expressly delegated to the agency would be frustrated by the agency's inability to exercise that implied power).

An additional source of authority to order the refund comes from the binding final remand order from the Court of Appeals. The PUC ordered the refund in this case after the Court of Appeals, having engaged in statutorily authorized judicial review, remanded the case to the PUC for reconsideration in light of the court's ruling that the PUC had made a legal error. *See Indep. Voters of Ill.*, 117 Ill 2d at 105, 510 NE 2d at 857-58 (concluding that commission could order refund where it was "a result of a direct, statutorily authorized, review of [a] Commission order" and where court had remanded the case "to correct the erroneous portion of the rates, not for original rate-making").[18] The authority to order a refund reasonably can be implied when a rate order has been reversed on judicial review and sent back to the PUC for additional proceedings. *See Appeal of Granite State Elec. Co.*, 120 NH 536, 540, 421 A2d 121, 123 (1980) ("[T]he PUC has authority to order the Electric Company to refund revenues collected under rates authorized and approved by the PUC but later found upon judicial review to have been collected under improper rates."). If the PUC could not order a refund in the circumstances presented in this case, judicial review would lose much of its effectiveness because the problem could only be addressed prospectively. *See Indep. Voters of Ill.*, 117 Ill 2d at 105, 510 NE 2d at 858 ("The function of the courts in reviewing Commission proceedings would be meaningless if no remedy could be provided after the court holds that a Commission-approved rate order included allowance of improper expenses and deductions for the utility company.").

We recognize, as the CAPs note, that certain statutory provisions authorize the PUC to order refunds in

---

[18] Notably, the court in *Independent Voters of Illinois* concluded that ratepayers were not entitled to refunds for amounts paid during the pendency of the appeal, and instead limited refunds to the period after the rates were invalidated. 117 Ill 2d at 99-100, 510 NE 2d at 855. That conclusion was based, at least in part, on statutes requiring utilities to collect the rates approved by the commission. *See id.* at 97, 510 NE 2d at 854. As explained above, this court has rejected that construction of Oregon's parallel statutory provision. The court also suggested that provisions allowing for a stay during appeal suggested that the utility was entitled to collect and keep rates approved by the commission in the absence of a stay. *Id.* We reject that conclusion. The availability of a stay does not make it the *only* option for correcting an error, particularly where the fact that the order is being appealed puts the parties on notice that the rates may be subject to reexamination.

specific circumstances. *See* ORS 757.215(4) (providing that, when a public utility has filed to establish new rates or increase existing rates, and the PUC conducts a hearing on those rates without suspending them, amounts exceeding rates later approved by the PUC must be refunded); ORS 757.215(5) (providing that the PUC has authority to authorize interim rates and to later order refund of any portion of those rates that was not justified). We do not agree with the CAPs, however, that those provisions preclude the PUC from ordering refunds in other circumstances. The fact that the PUC *must* order refunds in certain proceedings under ORS 757.215 does not mean that the PUC *may not* order refunds in other circumstances, such as those presented in this case. Express authority to act in one set of circumstances does not necessarily preclude implied authority to carry out similar actions in entirely different circumstances.[19] In fact, the PUC's authority to order refunds under ORS 757.215 suggests that allowing the PUC to order refunds here would not "materially alter the nature" of the PUC's authority. *See Southern Pacific Co. v. Heltzel*, 201 Or 1, 39-40, 44, 268 P2d 605 (1954) (concluding that Public Utilities Commissioner lacked authority to set minimum rates or order a railroad to increase rates because that power would alter the nature of the Commissioner's duties without guidance from the legislature).[20]

---

[19] An express grant of general power does not necessarily confer implied general powers. *See, e.g.*, *Southern Pacific Co. v. Heltzel*, 201 Or 1, 24, 268 P2d 605 (1954) ("The fact that the Commissioner has been given some power to act in some areas of utility regulation does not imply that he may exercise all the power that the legislature might have exercised had it chosen to act directly."). In this case, however, the implied power to order refunds is necessary to the PUC's ability to carry out its express duty to obtain "adequate service at fair and reasonable rates." *See* ORS 756.040(1) (setting forth powers and duties). Moreover, the express authority to order refunds of interim rates does not imply that refunds in all other circumstances are prohibited—the PUC's authority to order refunds on interim rates is not inconsistent with its authority to order refunds after a rate order is invalidated on judicial review. The absence of a conflict between the express and implied powers makes it more likely that the legislature intended to vest the implied power in the PUC, particularly given the legislature's direction that the PUC statutes should be liberally construed. *See* ORS 756.062(2) (so stating).

[20] Similarly, we reject the CAPs' argument that a statutory provision allowing for stay of a PUC rate order "upon the giving of [a] bond" demonstrates that the legislature intended losses incurred during appeal to be paid only by a bond, and not remedied by the PUC. *See former* ORS 756.590 (2003), *repealed by* Or Laws 2005, ch 638, § 21 (providing that PUC order can be stayed pending final disposition of a case "upon the giving of such bond or other security, or upon such

This court's decision in *McPherson et al v. Pacific P. & L. Co.*, 207 Or 433, 296 P2d 932 (1956), does not compel a different result, as the CAPs contend. In *McPherson*, this court held that a surcharge added to a public utility's rates had been approved lawfully by the Public Utilities Commissioner and therefore had been "established as [a] lawful rate[]." *Id.* at 461. As a result, the court did not have to reach the issue of whether the Public Utilities Commissioner or the court could order the utility to refund the surcharge. In addition, to the extent that *McPherson* discussed the commissioner's authority to order reparations, that discussion involved a different statutory context. The court emphasized, for example, that the railroad statutes conferred jurisdiction on the commissioner to award reparations, but that the public utility statutes did not; that analysis is outdated, however, because the PUC no longer regulates railroads and no longer has express authority to order reparations in some industries, but not others. Moreover, since *McPherson*, we have suggested that the PUC's refund authority was not a matter of settled law—in *Dreyer* we ordered the circuit court to abate its proceedings so that the PUC could determine "what, if any, remedy it [could] offer to PGE ratepayers, through rate reductions or refunds." *Dreyer*, 341 Or at 286.

We conclude that the PUC had authority to order PGE to issue refunds to the post-2000 ratepayers in this case. To the extent that the CAPs argue that the PUC declined to award them a remedy by ordering a refund only for the post-2000 ratepayers, we note that the PUC did not order a refund to the CAPs who claimed to be injured by the 1995-2000 rates because it determined that the CAPs were not injured by those rates. As we discuss below, whether the CAPs can nonetheless proceed in circuit court is an issue that they must address before that court.

## IV. INTEREST

As noted, when the PUC reexamined the 1995 to 2000 rates, it observed that the previously approved 17-year

---

conditions as the court may require"). At most, that provision indicates that the legislature intended errors identified during judicial review to be remedied by returning money to those injured. The existence of a remedy through a bond does not foreclose an alternative remedy through a refund.

period for PGE's recovery of its investment in Trojan "appropriately balanced the interests of the utility and its customers," but only because PGE had had the opportunity to earn a return on its investment. PUC Order No. 08-487 at 67. Consequently, when the Court of Appeals determined that the rates could not include a return on PGE's investment in Trojan, the PUC had to decide what rates it would have allowed if it had not included that factor in its rate calculation. *Id.* at 71. As part of that reconsideration, the PUC decided that it would not have used a proposed one year recovery period. The PUC explained that that would have led to "an immediate 30.5 percent increase in rates for one year," which would have been inconsistent with the PUC's policies "to avoid rate shock and to promote rate stability and intergenerational equity." *Id.* at 70. The PUC instead concluded that a 10-year period would have "equitably allocate[d] the benefits and burdens while allowing quicker recovery to offset any increase in PGE's risk profile" resulting from PGE's inability to earn a return on its investment in Trojan. *Id.* at 72.

The PUC also concluded that it would have been reasonable to include interest on the investment "to compensate for the time value of money" because PGE would be recovering its investment over a 10-year period. *Id.* at 71. As the PUC explained, "[t]o allow PGE the ability to fully recover that amount [of its investment] over time, we need to include some form of interest—not profit—to compensate the utility for the delayed recovery of the investment." *Id.* Although the PUC often uses a utility's authorized rate of return as the applicable interest rate when an amount is amortized over time, because of *Trojan I* the PUC reasoned that it could not use that rate in this case. *Id.* at 72. Therefore, instead of using (1) PGE's pre-tax rate of return for 1995 (13.22 percent) or for 1996 forward (13.34 percent); or (2) PGE's authorized rate of return for 1995 (9.51 percent) or for 1996 forward (9.6 percent), the PUC chose to use in its calculation an interest rate that was "unrelated to utilities" to "ensure the rate reflect[ed] solely the time value of money." *Id.* at 62 n 227, 73. The PUC calculated the rates it would have set had it allowed PGE to recover 7.09 percent interest, based on the Treasury rate for 10-year bonds in

1994. *Id.* at 73. URP now argues that *Trojan I* forbids that result, and that, independent of *Trojan I*, the PUC lacked the statutory authority to include interest in its recalculation. As explained below, we reject both of those arguments.

The holding in *Trojan I* prohibiting PGE from recovering a return on its investment in Trojan did not prohibit PGE from recovering interest because, in the public utility context, the rate of return—the return *on* investment—is distinguishable from interest: "Return is the term used in public utility regulation to describe the compensation which the owners receive over and above allowable deductions from gross revenues. It is a word having a connotation different from such words as earnings, net income, interest, and dividends." Ellsworth Nichols, *Ruling Principles of Utility Regulation: Rate of Return* 1 (1955). Although interest rates may be taken into account, a rate of return typically "pays something over and above the usual interest rate on well-secured loans, to compensate for the hazards of the business and for the profits of management." *Id.* at 210; *see also* Richard A. Posner, *Economic Analysis of Law* 142 (9th ed 2014) (explaining that a reasonable rate of return is "a weighted average of the long-term interest rate *plus* the rate of return to the equity shareholders that the agency considers appropriate in light of the risk of the investment and the rate of return enjoyed by shareholders in comparable firms" (emphasis added)); ORS 756.040(1)(a) (directing that rates are fair and reasonable if, in part, the return to the equity holder is "[c]ommensurate with the return on investments in other enterprises having corresponding risks"). Thus, *Trojan I* prevented the PUC from allowing a return on PGE's investment in Trojan, but did not prevent the PUC from allowing PGE to recover interest to account for the time value of money.[21]

_____

[21] *Trojan I* did not, as URP contends, equate the terms "return on investment" and "interest." Instead, the court equated the phrase "return on investment" with *profit. See, e.g., Trojan I*, 154 Or App at 706 (explaining that PUC orders allowed PGE to "include a 'rate of return' (*i.e.*, profit) component" in rates); *id.* at 713 (explaining that text of statute did not "contemplate[] a return or profit on undepreciated investment"). In fact, the court rejected PGE's attempt to justify the return on investment by characterizing it as interest, indicating that the court considered interest to be a separate concept. *See id.* at 713-14 ("PGE's arguments that turn on the word 'interest' instead of the term 'rate of return' also lose sight of ORS 757.355. *** It makes no difference whether *the profit* is called

Here, the PUC was careful not to recalculate rates using a factor that would allow PGE to recover a profit on its investment, instead relying on lower Treasury bond rates to account only for the time value of money. *See* Irving Fisher, *The Theory of Interest* 34-35 (1930) (describing a "pure rate of interest" as "the rate on loans which are practically devoid of chance," such as "safe securities of fixed terms not likely to be transferred or transferred often before maturity"); Paul A. Samuelson & William D. Nordhaus, *Microeconomics* 288 (19th ed 2010) ("The safest assets in the world are the securities of the U.S. government."). In other words, to the extent that interest generally accounts for both the time value of money and the risk involved in an investment, the PUC used an interest rate that primarily accounted for the time value of money, rather than for risk. *See* Samuelson & Nordhaus, *Microeconomics* at 288 (describing the bond rate as a "'riskless' interest rate"). *Trojan I* does not prevent the PUC from allowing PGE to recover interest to account for the time value of money.

In addition, the PUC's statutory authority to conclude that it would have allowed PGE to recover interest on its investment in Trojan can be implied from the PUC's discretionary ratemaking authority. As noted, the legislature expressly delegated the authority to establish fair and reasonable rates under ORS 756.040(1), and the PUC was charged with determining how to set those rates within the broader legislative policy. *See Springfield Education Assn.*, 290 Or at 230 (explaining that the legislature delegated authority to the PUC to set just and reasonable rates in a way that allows the PUC "to make delegated policy choices of a legislative nature within the broadly stated legislative policy"). We recognize, as URP notes, that the legislature has expressly stated when interest can be awarded in other statutes, including other provisions within ORS chapter 757. *See, e.g.*, ORS 757.215(6) (providing that refunds of interim

---

'interest' instead of a 'return.'" (Emphasis added.)). We also reject URP's argument that the court's reference to PGE recovering only the "principal amount of the undepreciated investment" demonstrates that the PUC cannot award interest. *See id.* The court was not asked to decide whether the "principal amount," if recovered over a period of years, would include interest to account for the time value of money or whether a recovery in the absence of interest would sufficiently compensate PGE for its investment in Trojan.

rates shall include interest). As discussed above, however, those express grants of authority, which address different circumstances, do not necessarily preclude the PUC from using interest in its recalculation, particularly where those other statutes indicate that the legislature intends to allow the PUC to award interest to account for the time value of money.[22] *See* ORS 757.215(6) (requiring the PUC to include interest on amount subject to refund after the PUC approves rates lower than interim rates); ORS 757.259(4) (allowing the PUC to authorize deferrals for later incorporation in rates of certain amounts, "together with interest established by the commission"). Those statutes indicate that the use of interest to account for the time value of money is within the policy choice expressed by the legislature—the PUC is charged with establishing "fair and reasonable rates" that "provide adequate revenue *** for operating expenses of the public utility." ORS 756.040(1). We therefore affirm the PUC's decision to include interest on PGE's investment in Trojan.

## V.   SUBSTANTIAL EVIDENCE

URP argues that the PUC's order is not supported by evidence that was in the record. Under ORS 183.482(8)(c), "[t]he court shall set aside or remand [an agency's] order if the court finds that the order is not supported by substantial evidence in the record." Substantial evidence supports an agency's finding "when the record, viewed as a whole, would permit a reasonable person to make that finding." *Id.* Here, URP asserts that, in making the calculations necessary for PUC Order No. 08-487, the PUC used two electronic spreadsheets provided by PGE and PUC staff in response to a July 2008 PUC request. Hard copies of those spreadsheets were submitted by PGE and PUC staff as part of the record in 2005 during the first phase of the remand proceedings, which addressed the 1995 to 2000 rates, but URP contends that the hard copies did not contain the formulas

---

[22] Similarly, although ORS 757.140(2) authorizes the PUC to allow rates that include "amounts on the utility's books of account which the commission finds represent undepreciated investment in a utility plant," which may not include interest, that statutory provision does not state that the PUC can include *only* amounts listed on the books of account, without adjustment for factors such as the time value of money.

and certain other data on which the PUC ultimately relied. Accordingly, URP reasons, the PUC's findings are not supported by evidence *in the record* because those formulas and data were not in the record.

Formulas, however, are methods of reasoning and analysis, not evidence. As long as the data used in those formulas is supported in the record—and URP does not point to any indication that the data were unsupported—the method for analyzing that data need not be separately supported by evidence. In addition, in a footnote in PUC Order No. 08-487, the PUC explained how it reached the conclusion that the 1995 to 2000 rates would have been higher if Trojan had not been included in rate base. The PUC detailed each of the ways in which it modified the spreadsheet provided by PUC staff. Thus, to the extent that the PUC had to disclose or explain that analysis, the PUC did so in the order.

## VI.   THE ABATED CIRCUIT COURT PROCEEDINGS

In *Dreyer*, this court issued a peremptory writ ordering the circuit court to abate the CAPs' claims against PGE for damages, pending the PUC's determination of "what, if any, remedy it [could] offer to PGE ratepayers, through rate reductions or refunds, for the amounts that PGE collected in violation of ORS 757.355 (1993) between April 1995 and October 2000." *Dreyer*, 341 Or at 286-87. The CAPs argue that the abatement should be lifted either because the PUC has no authority to provide a remedy to the CAPs or the PUC has declined to offer a remedy to the CAPs. URP similarly contends that this court should lift the abatement so that the ratepayers from 1995 to 2000 can pursue their remedies in circuit court.

We decline to reach that issue because it is not properly before this court in this proceeding, which arises out of the PUC's order following the remand proceedings stemming from *Trojan I* and *Trojan II*. *Dreyer* involved an entirely separate proceeding in circuit court that is not now before us. Accordingly, if the CAPs want the abatement lifted, they must address their request to the circuit court. *See Dreyer*, 341 Or at 286 ("Certainly, after the PUC has

made its ruling, plaintiff will retain the right to *return to the circuit court* for disposition of whatever issues remain unresolved." (Emphasis added.)). If the circuit court denies that request, the CAPs can appeal from that order.

## VII.   CONCLUSION

The PUC did not exceed either the scope of the remand or the scope of its statutory authority in PUC Order No. 08-487. Moreover, the order is supported by substantial evidence.

The decision of the Court of Appeals and the order of the Public Utility Commission are affirmed.